Argued and submitted November 1, 1983, affirmed February 8, 1984

## STATE OF OREGON,
*Respondent on Review,*

*v.*

## LARRY LEE LERCH,
*Petitioner on Review.*

(C 81-09-34281, CA A24731, SC 29862)

677 P2d 678

Stephen A. Houze, Portland, argued the cause and filed the brief for petitioner on review. With him on the petition for review was Birkland, Koch & Houze, Portland.

Robert E. Barton, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. With him on the brief were Dave Frohnmayer, Attorney General, and William F. Gary, Solicitor General, Salem.

CAMPBELL, J.

Linde, J., did not participate in this decision.

## CAMPBELL, J.

The defendant was indicted and convicted of the murder of Michael Hanset. He appealed his conviction to the Court of Appeals setting out numerous assignments of error. The Court of Appeals affirmed. *State v. Lerch*, 63 Or App 707, 666 P2d 840 (1983).

The only evidence of the corpus delicti, independent of the defendant's confession, was circumstantial. Our primary reason for allowing review was to consider the degree of proof required by ORS 136.425(1) to corroborate the defendant's confession, when the evidence is solely circumstantial.[1] The defendant raised this question in the trial court by motions for judgment of acquittal and directed verdict claiming that the circumstantial evidence must be clear and convincing. The defendant relies on *State v. Watts*, 208 Or 407, 301 P2d 1035 (1956). The Court of Appeals found that the circumstantial evidence used in this case to prove the corpus delicti was not clear and convincing, but that this court in *State v. Krummacher*, 269 Or 125, 523 P2d 1009 (1974), had in effect abolished the distinction between circumstantial and direct evidence as to quality of proof. Because the defendant also assigned as separate errors the admission of certain portions of the circumstantial evidence, it will be necessary for us to consider those rulings by the trial court. We affirm the Court of Appeals.

On Monday, July 27, 1981, seven year old Michael Hanset disappeared from his home.[2] He lived with his family on Southeast Belmont and near Colonel Summers Park in Portland. The defendant lived in an apartment on Southeast Morrison near the same park. In the area in question Belmont and Morrison run parallel to each other, a block apart, and are separated by the park. The boy was a frequent visitor to the park where he was in the habit of collecting used beverage cans and bottles from other visitors.

---

[1] The material part of ORS 136.425(1) is:

"* * * nor is a confession only sufficient to warrant [defendant's] conviction without some other proof that the crime has been committed."

[2] The issue as to whether the circumstantial evidence was sufficient to corroborate the confession was raised by the defendant's motions for judgment of acquittal and directed verdict and therefore the evidence must be viewed in the light most favorable to the prosecution. *State v. Garcia*, 288 Or 413, 421, 605 P2d 671 (1980).

Early in the afternoon of July 27th the defendant, with Michael in tow, obtained some change from Roy Shearer so that the boy could buy some lemonade at a stand in the park. Shearer lived near the park and on occasion hired the defendant to work in his landscaping business. Jose Guzman and the defendant spent a part of the same afternoon drinking beer in the park. Guzman saw the defendant give Michael ten cents to buy lemonade. He also saw the defendant wrestle with the boy. When Guzman and the defendant ran out of beer, they agreed that Guzman would go to his bank to get some money and the defendant would go to his apartment to get some ice. After Guzman got $10 from his bank, he decided that he needed another fifty cents to buy a short keg and went to the defendant's apartment house to borrow some more money. When Guzman arrived at the defendant's apartment house, an unidentified person opened the entrance door and told Guzman that the defendant was talking to someone. Guzman entered the apartment hallway and saw the defendant standing by his door. While the two men talked, the defendant kept the door to his apartment "more closed than open." The defendant gave Guzman some money and promised to meet him at the park with some ice. The defendant did not return to the park. At least two other people saw both Michael and the defendant in the park earlier the same afternoon. Michael was last seen alive in the park wearing only a pair of pants. The police were called about 9:00 p.m. and an extensive search was not successful.

In the morning hours on Wednesday, July 29th, one of the defendant's adult sisters visited him at his apartment. He was nervous and shaky. He wanted to talk to her about the "missing boy." He told her Michael Hanset had been in his apartment on Monday. He also told her he had taken a walk on Monday night and had seen a large white canvas bag in a drop box at Ninth and Belmont. He admitted to her that he recognized the bag as his own and it had a body in it.

During the afternoon of July 29th, Joseph George Jaha smelled an odor from the garbage drop box behind his fish market at 826 Southeast Belmont. He identified the odor as coming from a dead human body. He did not look inside the box or call the police. The garbage drop box was emptied by the disposal company on Thursday, July 30th. The contents of

the box were compacted and hauled to a landfill in Oregon City.

On the morning of Friday, July 31st, the defendant told another one of his sisters that on the previous Monday evening he had seen a duffle bag which he recognized as being his in a dump box. He also told her that the bag was tied with a piece of leather from one of his work boots and that he had opened the bag and a small foot fell out. The sister contacted another of the defendant's relatives who called the police. They arrested the defendant at his apartment on a different charge at approximately 5:00 p.m. on the same evening.

At approximately 7:00 p.m. on July 31st, the defendant, while in custody, was interviewed by two detectives. The defendant was advised of his *Miranda* rights and he waived them. He signed a form consenting to the search of his Morrison Street apartment. He also consented to take a polygraph test the following morning. During the four hour interview, he told the detectives that on July 27th he had seen Michael Hanset collecting empty bottles and that he had given the boy some change in the park. He had not seen Michael again. He told the detectives he had seen a foot sticking out of a laundry bag at the garbage box.

At 1:00 a.m. on August 1st, the two detectives, together with two officers from the state crime lab, searched the defendant's apartment. As a part of the search they examined several stains on the kitchen floor and took vacuum sweepings from the living room rug. Later at the trial, one of the detectives testified that in his opinion one of the stains was fecal matter. The vacuum sweepings included hair which was later used by one of the crime lab people to make hair comparisons.

At approximately 9:00 a.m. on August 1st, another detective gave the defendant a polygraph examination. After the detective told the defendant that he was not telling the truth, the defendant confessed. He said that he had taken the boy to his apartment to give him some bottles and the next thing he remembered he had his hand around the boy's throat and the boy was dead. The defendant said that he was under the influence of drugs. He then stated that he put the body in a laundry bag, tied it shut with a rawhide string, and carried it to the garbage box next to the fish market.

Police and landfill employees made an extensive and detailed search of the Oregon City landfill between August 4th and August 10th. They used search dogs. They found nothing. Although Michael Hanset knew the telephone numbers of his home and his grandmother's home, neither he nor his body has ever been found.

In his brief in the Court of Appeals, the defendant alleged among other assignments that the trial court had erred in allowing: (1) one of the detectives to testify that in his opinion one of the stains on the defendant's kitchen floor was fecal matter; (2) "opinion testimony regarding the smell of decomposing human flesh;" (3) "evidence relating to hairs and hair comparisons."

The Court of Appeals held that the trial court was correct in admitting this evidence. We must, as a preliminary step, re-examine these holdings in order to determine what makes up the circumstantial evidence that the state contends is sufficient to corroborate the confession. In other words, if the trial court should not have admitted the opinion testimony as to the fecal stain or the smell of decomposing human flesh or the hair comparisons, then the amount of circumstantial evidence available to corroborate the confession is correspondingly reduced.

Kerry Taylor was one of the Portland detectives who searched the defendant's apartment in the early morning hours of August 1st. At the trial he testified that on the defendant's kitchen floor he "observed a stain that I believed to be fecal matter." In the defendant's confession he said that he strangled the victim in the kitchen. A pathologist for the State testified that it was common for strangulation victims to defecate. A photograph of the stain taken on August 1st was received in evidence.

Detective Taylor's statement was offered and received as an opinion by a lay witness under OEC 701:

"If the witness is not testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to those opinions or inferences which are:

"(1) · Rationally based on the perception of the witness; and

"(2) Helpful to a clear understanding of testimony of the witness or the determination of a fact in issue."

In the context of this case, Taylor's opinion that he believed the stain to be fecal matter was admissible if it was rationally based upon his perception and was helpful to the determination of a fact in issue.

In the Court of Appeals, the defendant contended that Taylor's opinion was not "rationally based" because his perception of the reddish brown stain on the kitchen linoleum would permit several different inferences to be drawn as to the source of the stain, e.g., "shoe polish, food stains, or mud." The defendant also claims that Taylor's testimony was not necessary because he could have described the stain without giving his opinion and that the "most accurate portrayal of the stain" was the photograph which was received in evidence. The defendant argues that in spite of the lack of Detective Taylor's qualifications as an expert witness, the State set him up "as a sort of mini-expert" in the field which caused his opinion as to a crucial question in the case to have "the aura of an expert witness."[3]

 Oregon Rule of Evidence 701 is identical in substance to Rule 701 of the Federal Rules of Evidence.[4] The rule adopts a liberal standard for the admissibility of lay opinions. Kirkpatrick, Oregon Evidence, 292 (1982). The commentary by the legislature approves the proposition from an earlier Oregon case, *State v. Garver,* 190 Or 291, 315-316, 225 P2d 771 (1950), that a lay witness may testify as to what he has perceived by using a "shorthand" description which in reality is an opinion. The admission of opinion evidence is within the discretion of the trial court and it will only be reversed for an abuse of discretion. Commentary, OEC 701, 137; *Unitec Corporation v. Beatty Safway Scaffold Co. of Oregon,* 358 F2d 470, 477-478 (9th Cir 1966); *Fidelity Sec. Corp. v. Brugman et al,* 137 Or 38, 1 P2d 131 (1931).

---

[3] Detective Taylor at a pretrial hearing testified that he had been an uniformed police officer for a period of seven and one-half years and during that time he had patrolled skid row for three and one-half years. He also testified at the same hearing that as a homicide investigator, he had observed two strangulation victims who had defecated. This testimony was not repeated before the jury. On trial Taylor only told the jury that he was a detective assigned to the homicide division.

[4] Commentary, OEC 701, 137.

■ An essential difference between opinion testimony by a lay witness and an expert witness is that the lay witness is restricted to his personal perceptions while an expert witness may also testify from facts "made known to him at or before the hearing." OEC 703; FRE 703; *Teen-ed, Inc. v. Kimball Intern., Inc.* 620 F2d 399, 404 (3rd Cir 1980). 2 Jones on Evidence, §14:4, 591-592 (6th ed 1972) explains that a lay witness and an expert witness may testify as to the same subject matter:

> "The testimony of the chemist who has analyzed blood, and that of the observer who has merely recognized it by the use of the senses belong to the same legal grade of evidence, and though the one may be entitled to greater weight than the other with the jury, the exclusion of either is not sustainable."

11 Moore's Federal Practice §701.02 (2d ed 1983) states that to ensure:

> "* * * the most reliable and useful information is presented for consideration of the trier of fact * * * the rule [FRE 701] relies on the dynamics of the adversary system in which the proponent tries to elicit detailed testimony from a witness supporting his position to increase the weight given the testimony, while the opponent will try to discredit such evidence by bringing out on cross-examination any detail omitted. In any case, the fact finder is not bound to accept an assertion made in the form of opinion testimony."

■ We hold that the trial court did not abuse its discretion in allowing Detective Taylor to testify as to his opinion of the type of stain found on the defendant's kitchen floor. The opinion was rationally or reasonably based upon what Taylor may have seen on August 1st. The opinion was helpful to the jury to decide an issue—was the victim in fact strangled in the defendant's kitchen? We agree with the Court of Appeals that the photograph of the stain is not a complete and full substitute for Taylor's observation. It was taken at night. It shows a brown and yellow patterned linoleum with the stain in question spotlighted. Even with the added light it is difficult to describe the stain except to say that it is a brownish-yellow smear.

Taylor's opinion was "rationally based" upon the mere fact that he was a human being of the age of reason who could see. He was merely giving a "shorthand description" of what he saw. It is difficult to see how his opinion is different

from that of another person describing a spot on a white shirt as "blood," "catsup," or "lipstick." The fact that Taylor was a detective with the homicide division may have added to or detracted from the weight of his testimony—that was for the jury to determine.[5]

The defendant also claims that it was error to admit "opinion testimony regarding the smell of decomposing human flesh." This assignment of error is aimed at the testimony of Joseph George Jaha who testified that on the afternoon of July 29th, he smelled the odor of decomposing human flesh coming from the garbage drop box[6] behind his fish market on Southeast Belmont.

Jaha's testimony was offered and received as the opinion of a lay witness under OEC 701, *supra.*

Jaha testified that he had been in the wholesale and retail fish business all his life— "from father to son." He served in an infantry unit with the United States Army for a period of 13 months during the Korean conflict. During that period of time he saw and smelled decomposing human bodies. He could not describe the smell, except that it is worse than fish. Portland Police Detective Emil Bladow, a 24 year member of the force who had been assigned to the homicide division for 9 years, testified that he had personally smelled between 50 and 100 human corpses, and decomposing human flesh has a distinctive odor. Dr. William J. Brady, the State Medical Examiner, testified he had personally conducted 5,000 autopsies and that decomposing human flesh has a distinct and characteristic odor.[7]

The defendant contends that the possible prejudice of Jaha's testimony outweighs its probative value because there

---

[5] On cross-examination Taylor testified: (1) when he observed the stain on August 1st (prior to the defendant's confession) he did not form an opinion that it was a fecal stain,; (2) at the same time one of the state crime lab people tested the stain for blood with negative results; (3) the stain did not have a characteristic odor; and (4) that he did not mention the stain in the report he wrote concerning the search of the defendant's apartment.

[6] Jaha also testified that there was a television set and an old mattress on the top of the garbage drop box. This corroborated the defendant's statement to the officer on July 31st and the admissions to his sisters.

[7] Dr. William J. Brady's testimony would fit within the assignment of error, but the defendant does not challenge it directly.

are striking and disturbing aspects of the testimony which throw extreme doubt on the credibility of his ultimate opinion. In his brief in the Court of Appeals the defendant states:

> "The disturbing factors included witness Jaha's inconsistent testimony; the fact that he did not even examine the drop box after claiming to have smelled a body; that he did not immediately notify anyone of his perceptions; that his perception was inconsistent with the probable decaying process of Michael Hanset's body according to expert witnesses, this even assuming that said body was in the dumpster in question; that any smell would have been masked by the smell of rotting fish in the box; and the improbability of identifying a smell one hadn't sensed in 30 years." Appellant's brief, pp 37-38.

It appears the defendant is objecting to the admission of this evidence under OEC 403:

> "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

■ The determination of whether the possible prejudice of Jaha's testimony outweighed its probative value was within the discretion of the trial court. *Wilson v. Piper Aircraft Corporation,* 282 Or 61, 77, 577 P2d 1322 (1978). We hold that the trial court did not abuse its discretion.

The fact that Jaha could not describe the smell does not make his testimony objectionable. In *People v. Reed,* 333 Ill 397, 164 NE 847 (1929), the defendant was convicted of maliciously damaging and defacing a schoolhouse by the use of dynamite. The evidence showed the defendant placed dynamite in the stove and when the school teacher started a fire with paper and corncobs, it exploded. Several witnesses testified they were familiar with the odor and fumes of dynamite and that after the school house explosion they recognized the smell. The testimony was objected to because the witnesses were unable to describe the odor of dynamite. The Illinois Supreme Court affirmed the conviction:

> "Most persons would probably find it difficult to describe the odor of a rose, whiskey, beer, or limburger cheese, but this difficulty could scarcely be regarded as affecting the value of

their testimony that they were familiar with and recognized the particular odor." 333 Ill at 401, 164 NE at 850.[8]

■ We hold that the trial court did not abuse its discretion in admitting the testimony of Joseph George Jaha as an opinion by a lay witness under OEC 701. The defendant's objections go to the weight and not the admissibility of the opinion. Jaha's testimony was rationally based upon his perception in that he had previously experienced and recognized the smell of decomposing human flesh. The testimony was also helpful to the determination of a fact in issue—did the defendant put the victim's body in the garbage drop box?

The defendant also contends that even if Jaha's opinion were rationally based, it is not a proper lay opinion under OEC 701. He states that "this is really expert opinion masquerading as lay opinion." As we have previously pointed out, the same matter may be the subject of both lay and expert testimony. Jones on Evidence, *supra.* In this case perhaps Dr. William J. Brady, who had performed 5,000 autopsies, could have testified as an expert witness if he had personally smelled the odor.[9] It is doubtful that Brady could have testified on the basis of "facts or data * * * made known" to him "at or before the hearing" because Jaha could not describe the smell.

---

[8] The same rule of law is demonstrated in a different manner in *United States v. Arrasmith*, 557 F2d 1093 (5th Cir 1977) where the defendant was convicted of possession of 134 pounds of marijuana. A question on appeal was whether the smell of marijuana gave the border patrol agent probable cause to search the defendant's car. The following occurred during the agent's cross-examination:

"Q. What does marijuana smell like?

"A. Marijuana.

"[Defense Counsel]: Your honor, I don't think that answer is responsive.

"[THE COURT]: It is responsive. It smells like marijuana.

"[Defense Counsel]: Marijuana smells like marijuana?

"THE COURT: Yes, sir." 557 F2d at 1094.

The conviction was affirmed.

[9] OEC 703 states:

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

One of the differences between Detective Taylor's opinion and Jaha's opinion is that Taylor was testifying to a common everyday subject matter while Jaha was testifying to a smell that would be a rare experience to the average person. Jaha's prior experience allowed the judge in the first instance to pass upon his qualifications to testify as to the subject matter and secondly gave the jury a basis upon which to weigh his opinion. Perhaps Jaha's "specialized knowledge" would have allowed him to testify as an expert under OEC 702.[10] His opinion was not offered as expert testimony and that question is not before us.

The defendant also assigned as error the admission of "evidence relating to hair and hair comparison."

Julie Irene Hinkley was one of the state crime lab personnel who helped Detective Taylor and his partner search the defendant's apartment during the early morning hours of August 1st. She had been a criminalist for the Oregon State Police for a period of eight years.[11]

Hinkley, on August 1st by using a vacuum sweeper, obtained 21 hair samples from the defendant's apartment. Later she found 27 hair samples on a coat that belonged to Michael Hanset.[12] By the use of a comparison microsope, Hinkley compared the individual hair samples she had obtained from the apartment and the coat with each other and with known hair standards.

Hinkley obtained hair standards from people who were known to have recently been in the defendant's apartment or handled the boy's coat. These standards included hair

---

[10] OEC 702 states:

"If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

[11] Hinkley testified: "Just basically a criminalist is someone who processes all types of evidence in a criminal case. This would include like drug analysis, hair and fiber analysis, firearms identification, toxicology screening, blood alcohols, glass comparisons, paint comparisons, and things of this nature."

[12] Hinkley testified that she obtained several hundred hairs from the vacuum sweeper, but because she was looking only for "very light, fine, blond hairs," she eliminated all but the 21 samples. She also testified that she found only one hair on the coat which she did not use. "It was a very, very dark coarse hair. * * * and not from the same source as the other 27 very fine, blond hairs, so I discounted it."

from Hinkley, other police officers, the defendant, previous tenants of the apartment and one of the defendant's sisters. Hair was also clipped from the three search dogs used at the landfill.

On direct examination Hinkley testified:

"Q. And after examining the 21 hairs from the sweepings and the 27 hairs from Michael Hanset's coat, were you able to form any opinion as to their similarity or dissimilarity?

"* * * * *

"A. I found that three of the hairs found in the living room sweeping were microscopically similar in all respects, and they could be from the same source.

"* * * * *

"Q. The three hairs swept from the kitchen apartment are from, in your opinion, a common source with the 27 hairs you found in Michael Hanset's jacket?

"A. Yes.

"* * * * *

"Q. And did you compare them with the head hair [of a list of 11 people and 3 dogs]?

"* * * * *

"A. From all of the standards that I received into the laboratory, and I believe there were 14 or 15 of them, the only source that the three hairs could have originated would be from the same person that deposited hairs on the jacket."

On cross-examination Hinkley read from a police report that she had previously prepared:

"I have three hairs which are found in these sweepings which are microscopically indistinguishable from the hairs found on the jacket, * * * and [they] could be from a common source. There is insufficient unique characteristics present in these hairs for a more conclusive comparison."

Then the defense counsel asked:

"Q. In other words, you're saying there is a possibility they could be from a common source.

"A. Yes."

The defendant in the Court of Appeals in effect argued that the testimony of Hinkley was not probative or relevant because she was comparing unknowns with

unknowns. That is, the officer was comparing three unknown hair samples from the defendant's apartment with hair samples from the coat when it had not been established that the latter hair came from Michael Hanset.[13] Included in this argument is the statement from Hinkley that it was only "possible" and not "conclusive" that the hair samples she compared came from a common source.

This case was tried in April, 1982 after the Oregon Rules of Evidence were adopted. The relevance of evidence is controlled by OEC 401:

> " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

OEC 401 is identical to Rule 401 of the Federal Rule of Evidence. The adoption of OEC 401 changed the Oregon law only to the extent that it eliminated the distinction previously maintained between materiality and relevancy.[14]

> "Likewise, Rule 401 incorporates the limited notion of relevancy by requiring that evidence must tend to make a fact more probable or less probable than it would be without the evidence. This restates Oregon law to the effect that 'any evidence which tends to render the fact probable or improbable is relevant.' *Klingback v. Mediola,* 138 Or 234, 239, 6 P2d 237 (1931). In this state, if a fact 'will advance the search for truth' or 'throws some light upon the issue,' it is relevant. *Trook v. Sagert,* 171 Or 680, 688, 690, 138 P2d 900 (1943). Similarly, evidence is relevant and is admitted if it 'logically tends to prove the essential fact.' *Tanner v. Farmer,* 243 Or 431, 436, 414 P2d 340 (1966)." Commentary, OEC 401, 64.

OEC 401 also restates the law of our previous cases allowing testimony on the comparison of hair samples. *See State v. Kersting,* 292 Or 350, 638 P2d 1145 (1982); *State v. Harris,* 241 Or 224, 405 P2d 492 (1965).

---

[13] To support this argument the defendant states:

"The hairs from the jacket could have come from anywhere; it was handled dozens of times before being turned over to Hinkley and was in fact exposed to the elements at the landfill for an extended period of time, hardly a clean environment." Defendant's brief, p. 40-41.

[14] Commentary, OEC 401, 64.

In this case the jury could have found as a first step that the 27 fine blond hairs on the jacket came from Michael Hanset.[15] As a second step the jury could have determined that the three hairs in the sweepings from the defendant's apartment came from the same common source as the 27 hairs on the jacket. The evidence then would have a tendency together with other evidence in this case to make it more probable that Michael Hanset was in the defendant's apartment.

The testimony by Hinkley of the hair comparisons was only one part of the evidence which was admitted that had a tendency to prove that Michael Hanset was in the defendant's apartment. The jury could have considered Hinkley's testimony separately or together with the testimony of Guzman as to the defendant's actions on the afternoon of July 27th and the opinion of Detective Taylor of the fecal stain. The commentary, OEC 401, 63 quotes McCormick, Evidence, § 185, 436 (2d ed 1972) as saying, "A brick is not a wall," and a law review writer to the effect that every witness is not expected to hit a home run.[16] The defendant's arguments go to the weight and not the admissibility of the evidence.

■ We determined it was not error to admit the challenged evidence and proceed to the next step. Our chief reason for allowing review in this case was to consider the degree of proof required by ORS 136.425(1) to corroborate the defendant's confession when the evidence relied on is solely circumstantial. The defendant claims that the evidence must be clear and convincing.[17]

Since we allowed the petition for review, defendant has in effect expanded his argument to say that if there is no distinction in Oregon between circumstantial and direct evidence as to degree of proof, then the "some other proof"

---

[15] An eight inch by ten inch color photograph of Michael Hanset was received in evidence. From it the jury could observe the color and texture of his hair.

[16] Falknor, *Extrinsic Policies Affecting Admissibility,* 10 Rutg L Rev 574, 576 (1956), quoting Professor McBaine. Applying the baseball analogy to this case, the defendant could argue to the jury that the witness Hinkley "struck out" or "popped up" but he could not keep her from having her time at bat.

[17] In the context of civil cases we have said that clear and convincing evidence "means that the truth of the facts asserted is highly probable." *Supove et al v. Densmoor et ux* 225 Or 365, 372, 358 P2d 510 (1961).

required by ORS 136.425(1) must be clear and convincing. This divides our consideration of this part of the case into two questions: (1) is there a distinction between circumstantial and direct evidence as to degree of proof, and if the answer is no, then (2) what is the degree of the "some other proof" required by ORS 136.425(1) to corroborate the defendant's confession?

Before we consider these questions it is important to examine our statute and the common-law rule regarding the corroboration of a confession of a defendant.[18] The legislature has enacted ORS 136.425(1):

"A confession or admission of a defendant, whether in the course of judicial proceedings or otherwise, cannot be given in evidence against him when it was made under the influence of fear produced by threats; *nor is a confession only sufficient to warrant his conviction without some other proof that the crime has been committed.*"[19] (Emphasis added.)

---

[18] The reason for requiring the corroboration of the defendant's confession is set out in *State v. Howard*, 102 Or 431, 439, 203 P 311 (1921) as follows:

"The controlling reason for the rule that the mere confession of a crime is insufficient to sustain a conviction arose from the fact that in some instances persons have been convicted upon such confessions and thereafter the supposed victims turned up alive. While these occurrences were infrequent, they were sufficient in number to cause the courts in the first instance, and later the legislative power, to require that such confessions should be corroborated by extraneous evidence that the supposed victim was actually dead and that the death had been occasioned by some criminal agency so as to preclude the presumption that it had happened through accident or suicide."

7 Wigmore on Evidence §2070, 510 (Chadbourn Rev 1978) questions the policy of the rule:

"The policy of any rule of the sort is questionable. No one doubts that the warning which it conveys is a proper one, but it is a warning which can be given with equal efficacy by counsel or (in a jurisdiction preserving the orthodox function of judges) by the judge in his charge of the facts. Common intelligence and caution, in the jurors' minds, will sufficiently appreciate it, without formulating it in a rule of law. Moreover, the danger which it is supposed to guard against is greatly exaggerated in common thought. That danger lies wholly in a false confession of guilt. Such confessions, however, so far as handed down to us in the annals of our courts, have been exceedingly rare * * *. Such a rule, though not really needed, might be at least merely superfluous." (Footnote omitted.)

[19] A predecessor of our current statute was enacted in 1864:

"A confession of a defendant, whether in the course of judicial proceedings, or to a private person, cannot be given in evidence against him, when made under the influence of fear, produced by threats; nor is a confession only, sufficient to warrant his conviction, without some other proof that the crime has been committed." D p 478 § 214 (1845-1864).

McCormick on Evidence §158, 346-347 (2d ed 1972) explains the common-law rule that the confession of a defendant must be corroborated:

"Much confusion has been caused by the failure to differentiate carefully between two different formulations of the requirement. The first requires only that in addition to the confession the prosecution introduce independent evidence which tends to establish the reliability of the confession. The second—the requirement of independent proof of the *corpus delicti*—requires that the corroborating evidence tend to prove the commission of the crime. * * *.

"The vast majority of American jurisdictions have adopted the second approach. This, of course, requires that the *corpus delicti* be defined. Literally, the phrase means the 'body of the crime.' To establish guilt, it is generally necessary for the prosecution to show that (a) the injury or harm specified in the crime occurred, (b) this injury or harm was caused by someone's criminal activity, and (c) the defendant was the guilty party. To sustain a conviction, the requirement of independent proof of the *corpus delicti* demands only that the prosecution have introduced independent evidence tending to show (a) and (b). It is not necessary that the independent proof tend to connect the defendant with the crime. Nor need the independent proof establish these elements beyond a reasonable doubt. Jurisdictions differ widely in their formulations of the amount of proof required. Some require only 'slight' evidence, others a 'substantial' amount, and some phrase the requirement as one of a 'prima facie showing.' Once the required showing has been made, however, the confession may be considered together with the independent proof in determining whether the state has sustained its burden of proving elements (a) (b) as well as element (c)." (Footnotes omitted.)

Wharton's Criminal Evidence §691, 489 (13th ed 1973), and Am Jur 2d, Evidence §1137, 310-311 (1967), state the same common-law rule.

In *State v. Wm. Lester Schleigh,* 210 Or 155, 165, 310 P2d 341 (1957), this court quoted with approval from a three judge dissent in the prior case of *State v. Elwell,* 105 Or 282, 291, 209 P 616 (1922), where the predecessor statute of ORS 136.425(1) was referred to as follows:

"A fair and reasonable construction of the statute is, that there must be some proof tending to show that the crime has

been committed, aside from and in addition to the confession." 105 Or at 291.

In *State v. Henderson,* 182 Or 147, 190, 184 P2d 392, 186 P2d 519 (1947), this court again in referring to a predecessor statute (OCLA 26-937) said:

> "That section of our laws is satisfied when the state presents independent evidence of the corpus delicti * * *." 182 Or at 190.

ORS 136.425(1) tracks with the common-law rule. The part of the statute under consideration can be paraphrased: "without some evidence independent of the confession which tends to establish or to prove the corpus delicti."

The point we are making is that in spite of the loose language in some of our previous cases, it is not necessary that the corroborating "proof" independent of the confession prove or establish the corpus delicti. The statute only requires that the the state introduce independent evidence that tends to establish the corpus delicti. In addition to its function of tending to establish the corpus delicti, the independent corroborating evidence may be used together with the confession to prove all elements of the crime including the corpus delicti beyond a reasonable doubt.

The definition of corpus delicti set out in McCormick on Evidence, *supra,* fits Oregon's definition. In a homicide the corpus delicti consists of evidence: (1) that a death has occurred, and (2) that the death resulted from a criminal agency. *State v. Henderson,* 182 Or 147, 190, 184 P2d 392, 186 P2d 519 (1947).

The defendant contends that when the corroborating evidence is solely circumstantial it must be clear and convincing and relies on *State v. Watts,* 208 Or 407, 411, 301 P2d 1035 (1956):

> "We do not weigh the evidence; our duty is to determine whether or not there was sufficient circumstantial evidence, clear, cogent, and convincing, from which the jury in the performance of its legal duties could deduce the commission of a crime."

*Watts* in turn relied upon *State v. Weston,* 102 Or 102, 119-120, 201 P 1083 (1921), which in speaking of the quality of circumstantial evidence necessary to prove the corpus delicti said:

"In this state, direct evidence to establish either of these elements [of the corpus delicti] is not required, but where circumstantial evidence is relied upon it must be of the most cogent and convincing nature. * * * The case at bar depends upon its own peculiar facts and so long as the *corpus delicti* is proved by clear, unequivocal, cogent and convincing evidence, the law is satisfied."

The Court of Appeals, in affirming the defendant's conviction, held that the evidence of the corpus delicti need not be clear and convincing. It referred to its case, *State v. Smith,* 31 Or App 321, 324-325, 570 P2d 409 (1977), wherein it said that the traditional rule of circumstantial evidence set forth in *State v. Watts, supra,* has been "largely repudiated" by *State v. Krummacher,* 269 Or 125, 523 P2d 1009 (1974), and predicted that if this court "were faced with reevaluation of the rule of circumstantial evidence" set forth in *Watts, supra,* the rule "would be changed consistent with *State v. Krummacher, supra.*" 31 Or App at 325.

Both the *Watts* and the *Krummacher* cases cited and considered *State v. Dennis,* 177 Or 73, 159 P2d 838, 161 P2d 670 (1945). The material part of the *Dennis* opinion is:

"* * * The fact that a crime has been committed (the corpus delicti), and that it was done by the defendant, may be lawfully established by circumstantial evidence alone. But such evidence must be satisfactory. Mere suspicion, or mere probability of guilt, is insufficient. The evidence must be of the most cogent and convincing nature. * * * The evidence upon which the State relies for conviction must not merely coincide with, render probable, and be consistent with, the guilt of the accused, but it must be inconsistent with any reasonable theory of his innocence and incapable of explanation upon any other rational hypothesis than that of guilt." 177 Or at 77.

*State v. Krummacher, supra,* was a murder case and all of the incriminating evidence was circumstantial. The question presented was whether the evidence was sufficient to allow the jury to find guilt beyond a reasonable doubt. This court discussed *State v. Dennis, supra,* at length and said in part:

"It is our conclusion that *Dennis* does not mean, as it appears to say, that every rational hypothesis must be excluded. It

simply means that circumstantial evidence, like direct evidence, must indicate guilt to the extent that there is no reasonable doubt of that conclusion." 269 Or at 139.

It was the intention of this court in *Krummacher* to abolish any distinction between direct and circumstantial evidence as to degree of proof. It does not take a great deal of imagination to think of situations where the average fact finder would give more weight to circumstantial evidence than direct evidence. For example, circumstantial evidence in the form of a fingerprint might merit more weight than the direct eyewitness testimony of a person previously convicted of perjury.

The defendant has not cited to us and we have been unable to find any cases from other jurisdictions that make a distinction between direct and circumstantial evidence as to the degree of proof necessary to corroborate a defendant's confession. The statements in *State v. Watts, supra, State v. Weston, supra,* and *State v. Dennis, supra,* which are inconsistent with this opinion are disapproved.

The fact that we have concluded that there should be no distinction between direct and circumstantial evidence as to degree of proof does not end our consideration of this case. We have answered only the first question. We must now consider the second question: What is the degree of "some other proof" required by ORS 136.425(1) to corroborate the defendant's confession?

Prior to oral argument we submitted to the parties a question asking what level of proof was required in other jurisdictions to corroborate a defendant's confession.

The defendant has done a yeoman task in preparing his response to the question. He has catalogued, in an appendix to his memorandum, a table setting out the "quantum" of proof required in over 50 separate state and federal jurisdictions. In addition to the choices of "slight", "substantial", "prima facie", and "clear and convincing" given us by McCormick on Evidence, *supra,* and Wharton's Criminal Evidence, *supra,* the defendant lists "reasonable probability", "reasonable inference", "some", "other evidence tending to establish guilt", "tends", "really substantial", "any", "reasonable tendency", "sufficient evidence", "tends to generate belief",

"whatever weight", "beyond a reasonable doubt", and "competent and sufficient."

One of the difficulties with considering the degree, type, amount or quantum of proof required by other jurisdictions is that some of them have statutes different from ours and some of them apparently have no statutes. For example, Washington has a statute different from ours,[20] and apparently Idaho and California have no statute requiring the corroboration of a confession.

We refuse to expand the meaning of "some proof" to include such terms as "substantial", "clear and convincing" and "beyond a reasonable doubt." The word "some" by definition is "indefinite" and "indeterminate." Webster's New Third International Dictionary (Unabridged 1971).

There are cases from other jurisdictions that hold "some evidence" means more than a scintilla. *See Christie v. State,* 580 P2d 310, 315 (Alaska 1978). "Some" means more than "none." It probably means more than "slight" but less than "substantial," but both "slight evidence" and "substantial evidence" are "some evidence." We cannot find help from adjectives like "admissible" and "relevant"—the evidence has already passed those tests or it would not be in the record.

Although "some proof" does not define a certain amount of proof, it does serve the function of limiting the proof required under ORS 136.425(1). In other words, instead of requiring full or complete proof that a crime has been committed, "some" reduces or limits the amount required. The net result is that ORS 136.425(1) instead of requiring evidence that the crime has been committed or the corpus delicti established merely requires evidence that *tends* to prove or establish the corpus delicti. This is in accord with the common-law rule. McCormick on Evidence, *supra.*

The defendant has called our attention to two cases in which the degree of proof for the corroboration of the

---

[20] Section 10.58.030 of the Revised Code of Washington states:

"The confession of a defendant made under inducement, with all the circumstances, may be given as evidence against him, except when made under the influence of fear produced by threats; but a confession made under inducement is not sufficient to warrant a conviction without corroborating testimony."

defendant's confession is described as "some." *Nelson v. State,* 50 Del 96, 123 A2d 859 (1956); *State v. Dudley,* 19 Ohio App2d 14, 249 NE2d 536 (1969). In the Delaware case the defendant was convicted of manslaughter. In the Ohio case the victim or his body was never found and the defendant was convicted of assault with intent to kill. In each case the chief issue was the degree of proof required to establish the corpus delicti apart from the defendant's confession. Neither case involves the interpretation of a corroboration statute.

In the *Nelson* case, the court in affirming the conviction said:

> "The accepted rule is that it is enough if there is some evidence of the corpus delicti corroborating the confession, provided that all the evidence taken together proves the corpus delicti beyond a reasonable doubt. 7 Wigmore on Evidence, §2073; 2 Wharton's Criminal Evidence, §640; *Jones v. State,* Md., 52 A2d 484, 488." 50 Del at 101, 123 A2d at 862.

In *State v. Dudley, supra,* the court also affirmed the conviction and approved the following statement:

> "It is sufficient if there is *some* evidence outside of the confession that tends to prove *some* material element of the crime charged." (Emphasis in original.) 19 Ohio App2d at 24, 249 NE2d at 543.

■ We hold that "some proof" means that there is enough evidence from which the jury may draw an inference that tends to establish or prove that a crime has been committed.[21]

■ We find it unnecessary to repeat the details of this case. Suffice it to say that we find there is some proof independent of the defendant's confession that tends to prove the corpus delicti and that a jury could have found from the

---

[21] The state has argued that the defendant's admissions to his sisters can be used to corroborate his confession. It relies upon a literal reading of ORS 136.425(1). It has also cited to us *State v. Fong,* 211 Or 1, 314 P2d 243 (1957), and *State v. Weston,* 102 Or 102, 210 P 1083 (1921), to support its position.

We do not reach this question because we find that there is sufficient evidence without the admissions to corroborate the defendant's confession.

We note that the state may be relying on dicta in the above cases. In both *State v. Fong, supra,* and *State v. Weston, supra,* the defendants were convicted of second degree murder, but the convictions were reversed and remanded on other grounds.

independent proof and the defendant's confession that the state sustained its burden of proof as to all elements of the crime beyond a reasonable doubt.

We find it unnecessary to consider the defendant's other assignments of error.

The conviction of the defendant is affirmed.