Argued and submitted April 30, convictions on Counts 1 through 21 reversed; sentences vacated; remanded for resentencing; otherwise affirmed September 5, 2007

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## MICHAEL SCOTT SIMONS,
*Defendant-Appellant.*

Benton County Circuit Court
CM0420445; A125571

167 P3d 476

Bronson D. James, Deputy Public Defender, argued the cause for appellant. With him on the brief were Peter A. Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Kaye Ellen McDonald, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Willliams, Solicitor General.

Before Haselton, Presiding Judge, and Armstrong and Rosenblum, Judges.

ROSENBLUM, J.

**ROSENBLUM, J.**

Defendant, a nursing assistant in a hospital, was convicted of one count of rape in the first degree, ORS 163.375, two counts of sodomy in the first degree, ORS 163.405, seven counts of unlawful sexual penetration in the first degree, ORS 163.411, and 11 counts of sexual abuse in the first degree, ORS 163.427, based on his alleged conduct with three of his patients. He was also convicted of two counts of sexual abuse in the third degree, ORS 163.415, and one count of private indecency, ORS 163.467, based on incidents involving two of his coworkers.[1] On appeal, defendant contends that he was entitled to a judgment of acquittal with respect to the 21 counts involving his patients because the state failed to present legally sufficient evidence to corroborate his confession as to those counts. ORS 136.425(1). We agree with defendant and therefore reverse in part.

We review a trial court's denial of a motion for a judgment of acquittal to determine whether, after viewing the facts in the light most favorable to the state, a rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt. *State v. Cunningham*, 320 Or 47, 63, 880 P2d 431 (1994), *cert den*, 514 US 1005 (1995). Only if a defendant's confession is supported by legally sufficient corroborating evidence may both the confession and the independent corroborating evidence be considered in determining whether that standard has been met. ORS 136.425(1); *State v. Lerch*, 296 Or 377, 398-99, 677 P2d 678 (1984).

Defendant worked as a nursing assistant and medication aide in the residential and special care unit of a hospital from December 2003 through February 2004. He was 23 years old at the time. The special care unit housed individuals with Alzheimer's disease, including three women, S (in her early 80s), R (age 87), and B (age 62). Defendant's duties included assisting S, R, and B with personal care activities such as bathing, dressing, and using the bathroom.

---

[1] Defendant does not challenge those convictions.

On March 18, 2004, defendant was investigated by the police based on reports of sexual misconduct made by two of his former coworkers. By that time, defendant had been terminated from his employment at the hospital based on those incidents. The first involved M, a housekeeper at the facility. She reported that, on December 24, 2003, defendant had grabbed her from behind when they were in the elevator together, rubbed her breasts, and thrust his penis against her buttocks. In the second incident, which occurred on February 20, 2004, defendant asked another coworker, V, if he could perform oral sex on her. He said he wanted to have oral sex with her because she was an older woman, and he liked older women. She refused and got up to leave the room. When she turned around, defendant had pulled his erect penis out of his pants and was masturbating. He followed her, tried to force her into an empty room, and then followed her around the rest of her work shift, continuing to make sexual comments. At the end of her shift, he followed her to her car, asking that she let him in and that she watch him masturbate.

In response to questioning by Detective Harvey, defendant admitted to the conduct involving both women, although he maintained that his touching of M was "accidental." Harvey then asked him if he had ever had a consensual relationship with either woman. Defendant replied that he had not, but said that he had "sexual problems" and was trying to work them out. He also told Harvey that he is attracted to older women, and he "has always wanted to have sex with one." Harvey later became concerned by defendant's statements, particularly in light of defendant's former employment working with elderly women in the Alzheimer's unit. As a result, he arranged for another interview of defendant, this time with Detective Oja of the Oregon State Police.

Oja began by asking defendant to go over what he had already told Harvey about the two incidents with his coworkers, which defendant did. He then asked defendant if he had had any sexual contact with patients at the hospital. Defendant at first said no. Oja then asked him, "Are you sure? Is there anything that could have been sexual for you, or maybe even sexual for them even if it wasn't for you?" Defendant replied, "Well, maybe for them." He then

described an incident in which he was rinsing the vaginal area of one of his patients[2] with a handheld shower head, and she made a sound expressing pleasure. At that point, he gave the patient the shower head and let her rinse herself off. He also told Oja that one patient, S, liked to grab the crotches of male staff and that once she grabbed him in that area. He said that he stepped away and told S, "You don't need to do that."

Oja testified that, at that point, he realized that he needed to ask more pointed questions:

"As we talked I asked [defendant] if it was—if he was sure anything else had happened, you know, did anything else happen, and he said, 'Well, there is something I need to tell you, that she did it more than once, and I allowed her to,' and at that point I realized I needed to ask more specific questions with regard to, you know—because I had to keep saying, 'Are you sure? Is there anything else?' and he kept saying, 'Well, yeah. It happened more than once. I allowed it to happen,' and at that point I started asking him more specific questions as to sexual acts."

In response to those specific questions, defendant then admitted that S had touched his bare penis on more than one occasion, that S had put her mouth on his bare penis, that he had touched S's breasts with his hands or his mouth, that he had put his mouth on her vagina, and that he had had sexual intercourse with her. He also admitted to touching, with his fingers, the vaginas and clitorises of two other patients, R and B, on three to five occasions each. Oja asked defendant if he was afraid of "people walking in and getting caught doing that" and defendant said yes. Defendant acknowledged that all three women were Alzheimer's patients and that the acts occurred when he was alone with them while working night shifts. Oja then had defendant repeat his statements on tape.

Based on those statements, defendant was subsequently charged with one count of first-degree rape, two counts of first-degree sodomy, one count of unlawful sexual penetration in the first degree, and five counts of sexual abuse for his conduct involving S; three counts of unlawful

---

[2] Defendant later identified that patient as R.

sexual penetration in the first degree and three counts of first-degree sexual abuse for his conduct involving R; and three counts of unlawful sexual penetration in the first degree and three counts of first-degree sexual abuse for his conduct involving B.

The case was tried to the court. In addition to evidence of defendant's statements to police and of his conduct with respect to his coworkers, as described above, the state adduced the following evidence at trial. Defendant had unsupervised access to S, R, and B and was alone with them when he bathed and dressed them. He worked many night shifts and often worked extra shifts. According to Davis, another nursing assistant in the unit, defendant stayed overnight at the facility on a "fairly regular" basis, even when he wasn't working, for example, when he worked an evening shift followed by a day shift the next day, or if he was too tired to drive, or was short on gasoline for his car. Davis also testified that defendant told her that he thought one of his patients had responded in a sexual way on one occasion when he was helping her shower.

In addition, Davis, who sometimes was responsible for waking patients in the morning, testified that S's demeanor began changing around November and December of 2003. Whereas before S would react sweetly and try to help, during this time, she was sometimes angry and would try to hit Davis, which "was not like [her]." Davis told the investigating officer that many of those mornings followed nights in which defendant had worked the night shift. At trial, however, Davis cautioned that this may have been because defendant worked so many nights and "was almost always there."

After the state presented its evidence, defendant moved for a judgment of acquittal with respect to all of the charges involving S, R, and B, on the ground that the state had failed to produce evidence corroborating his confession to those crimes. Defendant argued, in part, that the state's attempt to corroborate the core of his confession by "cherry-pick[ing]" the statements he made to the police and characterizing some of them as admissions, rather than confessions,

was legally impermissible under Oregon law. As to that point, the trial court concluded:

> "I'm not going to get into the issue regarding the difference between confessions and admissions. I don't think I need to reach that issue, although, in reviewing the evidence, *the statements that were made were all acknowledgments of guilt made for the purpose of acknowledging his guilt*, and they were confessions, or part—the statements made—combined together created the confessions and the acknowledgment of guilt."

(Emphasis added.)

However, the court found that the circumstantial evidence, including evidence that defendant was employed at the facility where S, R, and B lived; that he had unsupervised access to them during the relevant time frame; that he assisted them with feeding, dressing, and bathing; that he often worked alone on night shifts and had private, regular contact with them; that he told another employee about one of the victim's sexual reaction during a shower; that he displayed inappropriate sexualized behavior in the workplace; and that he told a coworker that he was attracted to older women in a sexual way, was legally sufficient to substantiate defendant's confession to all of the charges involving S, R, and B. The court concluded that the evidence, considered together with defendant's confession, was sufficient to prove those charges beyond a reasonable doubt. Accordingly, the court denied defendant's motion for a judgment of acquittal and, ultimately, found him guilty of those charges.

■    On appeal, defendant assigns error to the trial court's denial of his motion, arguing that none of the independent evidence relied on by the trial court to corroborate defendant's confession actually established the *corpus delicti* of the alleged crimes against S, R, and B, as required by ORS 136.425(1). In response, the state first disagrees with the "trial court's apparent legal determination that all of defendant's statements to the police during interviews were part of the same confession." According to the state, defendant made a series of statements to Oja that, because they were not intended as acknowledgments of guilt and were not so closely related to his confession as to be part of it, were properly

characterized as admissions and could thus be used to corroborate his confession. The state also argues that, even without those statements, there was enough circumstantial evidence from which a jury could draw inferences tending to show that the alleged crimes had been committed, which is all that is required under the applicable legal standard.

Under Oregon law, a defendant cannot be convicted based solely on an uncorroborated confession.[3] ORS 136.425(1) provides:

"A confession or admission of a defendant * * * cannot be given in evidence against the defendant when it was made under the influence of fear produced by threats; *nor is a confession only sufficient to warrant the conviction of the defendant without some other proof that the crime has been committed.*"

(Emphasis added.) To satisfy the emphasized portion of the statute, there must be independent proof of the *corpus delicti*, that is, that (1) the injury or harm specified in the crime occurred, and (2) that this injury or harm was caused by someone's criminal activity. *Lerch*, 296 Or at 393-94. It is not necessary that the corroborating evidence itself *establish* the *corpus delicti*, rather, "some proof" as used in ORS 136.425(1) "means that there is enough evidence from which the jury may draw an inference that tends to establish or prove that a crime has been committed." *Id.* at 398. It is also not necessary that the "other evidence" corroborate every element of an offense. *State v. Muzzy*, 190 Or App 306, 316, 79 P3d 324 (2003), *rev den*, 336 Or 422 (2004). However, there must be independent evidence that tends to establish the *corpus delicti* for *each* offense charged. *State v. Fry*, 180 Or App 237, 244, 42 P3d 369 (2002).

A defendant's statement, if it is made for some purpose other than to acknowledge guilt, and if it is not so closely related to the defendant's confession as to become a part of it,

---

[3] The traditional justification for the corroboration rule, adopted in some form in all jurisdictions, is to guard against false confessions. *See* John W. Strong, 1 *McCormick on Evidence* § 145, 555 (4th ed 1992). It is less clear that the rule also serves to deter coercive police practices in obtaining confessions. *Id.* ("At best the requirement achieves this objective indirectly, and the function is perhaps more effectively accomplished by other legal requirements relating to confessions." (Footnote omitted.)).

is properly deemed an admission and may itself be used to corroborate the defendant's confession. *State v. Manzella*, 306 Or 303, 315-16, 759 P2d 1078 (1988).[4] In distinguishing between confessions and admissions, the Supreme Court in *Manzella* expressly declined to adopt a content-based definition of confession, finding such a test to be unworkable. *Id.* at 315. Instead, relying on *State v. Reinhart*, 26 Or 466, 477-78, 38 P 822 (1895), in which it had concluded that the defendant's bookkeeping entries were not a confession because they were made, not to acknowledge guilt, but because they were required as part of his job, the court explained:

> "[S]tatements made for some purpose other than to acknowledge guilt, *i.e.*, exculpatory statements or statements made as part of a person's employment duties, are not confessions. It follows, then, that a 'confession' must have been made after the commission of the crime in question, for the purpose of acknowledging that the speaker is guilty of some criminal offense. If, in the course of the confession, the accused admits one or more elements of the crime charged, the state must produce 'some other evidence' of that element."

*Manzella*, 306 Or at 316. The court also emphasized that "[t]he state may not dissect a confession and use isolated statements to corroborate the 'core' of the confession." *Id.* at 316 n 13.

■        Under *Manzella*, a defendant's statement may constitute a confession, rather than an admission, even if, considered objectively, the thing confessed to is not actually a crime or the defendant has not acknowledged every material element. *Id.* at 315. The converse is also true. That is, even if a statement objectively acknowledges the commission of all

---

[4] In *Manzella*, the defendant told a police officer arriving at the scene of an accident that he had been rear-ended while waiting in a traffic lane to make a left turn. After the defendant was confronted with information that the officer received from checking his driver's license, the defendant confessed to driving with a suspended license. The court held that the defendant's initial statement—that he had been rear-ended—could be used to corroborate the driving element of his later confession to DWS, because he made the statement for the purpose of furthering an investigation of an automobile accident, and it was not so closely related to his confession that it became part of it. The court found it significant that the defendant made the statement before he was confronted with evidence showing that his license had been suspended and that a break occurred between that statement and his confession to the crime. 306 Or at 316.

of the elements of a crime, it is not a confession if it was made for some purpose other than to acknowledge guilt. *Id.* at 316. Thus, "in order to determine the *purpose* of a statement, we must ascertain the subjective intent of the speaker, not just the objective content of the statement." *State v. Anderson*, 103 Or App 436, 439, 797 P2d 1072 (1990), *rev den*, 311 Or 60 (1991) (emphasis in original); *see also Muzzy*, 190 Or App at 320-21 (concluding that, although the extent to which the "purpose" determination is "objective, subjective, or some combination of the two," is not entirely clear, determination that the defendant's subjective purpose in writing a letter of apology to his victim was to acknowledge his guilt was "amply substantiated by defendant's circumstances at the time that he wrote the letter").

In this case, the state argues that some of defendant's initial statements to the police during his second interview—specifically, his statement that he noticed R's sexual reaction in the shower, that S grabbed his penis more than once, and that she put her mouth on it at least once—were not part of his later confessions to the crimes against S, R, and B because they were clearly intended to be exculpatory, not acknowledgments of guilt. The state also reasons that, "[h]ad the interview stopped there, his statements could not be deemed to be confessions to the charged crimes against the three Alzheimer's patients. They are no more 'confessions' simply because defendant subsequently acknowledged that his statements were not a complete or entirely accurate accounting of what had happened."

First, as discussed above, the fact that the conduct admitted to may not constitute a crime is not in and of itself determinative of whether a statement is a confession or an admission. Second, the state's arguments ignore our standard of review. To the extent that the "purpose" determination involves defendant's subjective intent in making the statement, that intent is a question of fact. *Cf. State v. Coen*, 203 Or App 92, 103, 125 P3d 761 (2005), *rev den*, 341 Or 141 (2006) (whether an officer subjectively believed that he had probable cause for an arrest is a question of fact). Here, the trial court made an express finding that all of defendant's statements to the police[5] were made for the purpose of

---

[5] Although defendant also made statements admitting to the crimes during recorded telephone calls from jail after his arrest, it is clear from the trial court

acknowledging his guilt. Accordingly, we are bound by the trial court's finding on the issue if there is any evidence in the record to support it. *Id.*

There is ample evidence to support the court's finding that defendant's subjective intent in making the statements to the police was to acknowledge his guilt. The statements were prompted by questions from the police specifically investigating whether defendant had had sexual contact with his patients, after he had already confessed to crimes against his coworkers. They were not spontaneously offered during the investigation of a different incident, as in *Manzella*, or, as in *Anderson*, before questioning by police had actually begun. His statement that "there is something I need to tell you," before admitting that he had let S touch his penis with her hand and that he had let her touch his penis with her mouth, and his acknowledgment that he was fearful of being caught in sexual behavior with patients, also indicates defendant's intent to acknowledge his guilt.

In any event, we further conclude that defendant's statements to the police were so intertwined with his confession as to be part of it. Unlike in *Manzella*, there was no temporal break between the statements that the state aserts are admissions and those that the state agrees are part of his confession. The statements at issue were all made in response to police questioning of defendant about potential patient abuse; that the police were essentially acting on a hunch and had no evidence at that time of other crimes with which to confront defendant does not transform his answers to those questions from confessions to admissions. Even less persuasive is the state's argument that defendant's admissions can be distinguished from his confession based on a shift in the detective's interviewing strategy from general questioning about possible sexual activity to questions about specific sexual acts. Again, as the Supreme Court cautioned in *Manzella*, "[t]he state may not dissect a confession and use isolated statements to corroborate the 'core' of the confession." 306 Or at 316 n 13.

---

transcript that the trial court's ruling pertained to defendant's statements to the police. Indeed, the state did not argue below (nor does it argue on appeal) that the statements from jail were admissions, not confessions, and thus could be used to corroborate defendant's confession.

In short, we conclude that none of defendant's statements to the police constitutes independent corroboration of his confession. The question remains whether, absent those statements, there was enough evidence from which a fact-finder could "draw an inference that tends to prove" that (1) "the injury or harm specified in the crime[s] occurred" and (2) that "this injury or harm was caused by someone's criminal activity." *Lerch*, 296 Or at 393-94, 398. Accordingly, we must first identify the injury or harm that must be corroborated.

As noted, all of the crimes charged were sex offenses—namely, first-degree rape (ORS 163.375(1)(d)), first-degree sodomy (ORS 163.405(1)(d)), first-degree unlawful sexual penetration (ORS 163.411(1)(c)), and first-degree sexual abuse (ORS 163.427(1)(a)(C))—predicated on the alleged victims' incapacity to consent to the specified sexual conduct by reason of "mental defect or physical helplessness." Thus, the proscribed harm or injury, with respect to each charged offense, was being subjected to the specific sexual contact described in the indictment for that offense, without the person's consent.[6] *See Fry*, 180 Or App at 246 (some evidence from which a jury could infer sexual intercourse was necessary to corroborate the defendant's confession to rape and incest). Defendant concedes that the evidence was sufficient to establish that S, R, and B were incapable of consent as a result of a mental defect. Thus, we are left to determine whether there was legally adequate evidence to corroborate the specific sexual contact described in each of the charged offenses.

We begin with the evidence common to all of the victims. First, there was evidence that defendant worked at the facility where S, R, and B lived and that he had private, unsupervised access to them. Defendant's job duties included helping the women bathe and dress. He often worked double

---

[6] The indictment alleged the following specific acts: Count 1, sexual intercourse involving S; Count 2, putting his penis on S's mouth; Count 3, putting his mouth on S's vagina; Count 4, penetrating S's vagina; Count 5, touching S's vagina; Counts 6, 7, and 8, having S touch his penis; Count 9, touching S's breasts; Counts 10, 11, and 12, penetrating R's vagina; Counts 13, 14, and 15, touching R's vagina; Count 16, 17, and 18, penetrating B's vagina; Counts 19, 20, and 21, touching B's vagina.

shifts and night shifts, and he sometimes stayed overnight in the facility when he was not working.

From that evidence, a factfinder could infer that defendant had ample opportunity to be alone with S, R, and B when they were undressed; that, because of their illnesses, there was little risk that they would resist or report him; and that he worked extra shifts and night shifts in order to have more time alone with them. In other words, a factfinder could infer that defendant had plenty of opportunity to commit the crimes to which he confessed. However, as *Manzella* made clear, opportunity alone is insufficient to infer that the injury occurred. 306 Or at 307-08 (mere presence at scene of an accident did not permit an inference that the defendant had been driving).

The state also presented evidence that defendant was sexually aggressive with two of his older female coworkers, that he told a coworker that he liked older women and wanted to have sex with one, and that he told a coworker that he noticed what he thought was a sexual reaction from one of his patients. That evidence would permit an inference that defendant was sensitized to the sexual behavior of his patients, that he was sexually attracted to older women, and that he acted on that attraction in his conduct with his coworkers. The problem, however, is that, even considered as a whole, the evidence does not support a reasonable inference that S, R, or B suffered harm, much less that they were subjected to the specific sexual harm identified in each of the named offenses. *See generally Manzella*, 306 Or at 308 (evidence that the defendant gave his driver's license number to police officer insufficient to permit an inference that the defendant was driving).

There is one final piece of evidence relating to S that we must consider: the change in S's behavior. As noted, Davis testified that S's demeanor in the mornings changed around November or December of 2003 from being sweet and helpful to sometimes being angry and violent. Davis originally told the investigating detective that many of those "angry" mornings followed nights in which defendant had worked the evening shift; however, at trial, Davis testified that she may

have said that simply because defendant worked so many nights, and "he was almost always there."

Although the addition of that evidence makes it a closer question, at least with respect to the allegations concerning S, again, we conclude that it is insufficient.[7] Even if that evidence could support an inference that some harm to S occurred on the nights preceding the mornings when S awoke angry,[8] it does not support a reasonable inference that S sustained the specific sexual harm identified in the charged offenses—that is, sexual intercourse, defendant putting his penis on S's mouth or putting his mouth on her vagina, penetrating or touching her vagina, having her touch his penis, or touching her breasts.

This stands in stark contrast to *Lerch*. In that case, the defendant confessed to murdering a seven-year-old child. Although the child's body was never found, there was evidence that the child had disappeared; that the defendant had made statements, independent of his confession; that he had seen a duffel bag belonging to him with a body in it; that hair taken from the defendant's jacket matched the child's hair; and that a person familiar with the smell of decaying flesh had noticed such a smell coming from a dump box near the defendant's apartment. The Supreme Court concluded that the state's evidence sufficiently "tended" to prove the *corpus delicti* of the crime of murder. 296 Or at 399; *see also Muzzy*, 190 Or App at 322 (victim's statements that the defendant was "playing with himself" or "playing with his thing" was sufficient to corroborate that the harm specified in the crime as charged—witnessing an act of sexual conduct—had in fact occurred); *Fry*, 180 Or App at 246 (child victim's statements that her father once put his penis between her legs and that it hurt when he did so, combined with physician's testimony

---

[7] Because of that conclusion, it is obviously unnecessary for us to decide whether that evidence may be used to corroborate defendant's confessions to the crimes against the *other* victims. *See Fry*, 180 Or App at 244 ("Proof that a different crime has been committed cannot satisfy that requirement [that there must be independent evidence tending to establish the *corpus delicti* for each charged offense], nor can proof of one charged crime satisfy the requirement as to a different charged crime.").

[8] Even that proposition is questionable without more—for example, expert testimony indicating that S's behavior change was consistent with injury or abuse.

that the pain could have been the result of the defendant touching the child's hymen, was sufficient "other proof" to support incest and one rape conviction).

Here, on the other hand, there was no physical evidence of any kind, no victim or witness statements as to the alleged harm, no testimony that defendant had ever acted inappropriately, sexually or otherwise, with any of his patients,[9] and no evidence that he was even in any of their rooms at inappropriate times or when he was not on duty. In sum, the state presented insufficient evidence, apart from defendant's confession, "tending to prove" that the harms alleged against S, R, and B actually occurred.[10]

Convictions on Counts 1 through 21 reversed; sentences vacated; remanded for resentencing; otherwise affirmed.

---

[9] The fact that defendant noticed a patient's sexual response is not evidence that defendant himself acted inappropriately.

[10] Therefore, we do not reach the second part of the inquiry, that is, whether the harm was caused by someone's criminal activity.