Argued and submitted May 9, judgment of conviction and sentence of death affirmed September 9, 1994

# STATE OF OREGON,
*Respondent,*

*v.*

# CLINTON WENDELL CUNNINGHAM,
*Appellant.*

## (CC 91CR2626FE; SC S39759)

880 P2d 431

Thomas Kolberg, Judge.

David E. Groom, Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief were Sally L. Avera, Public Defender, and Stephen J. Williams, Deputy Public Defender, Salem.

Kaye E. Sunderland, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were Theodore R. Kulongoski, Attorney General, Virginia L. Linder, Solicitor General, and Janet A. Metcalf and Brenda JP Rocklin, Assistant Attorneys General, Salem.

VAN HOOMISSEN, J.

Unis, J., concurred in part and specially concurred in part and filed an opinion, in which Durham, J., joined.

Fadeley, J., dissented and filed an opinion.

## VAN HOOMISSEN, J.

This is an automatic and direct review of a judgment of conviction of aggravated murder and sentence of death. *See* ORS 163.150(1)(g) (providing for automatic and direct review in the Supreme Court); ORAP 12.10 (automatic review in death sentence cases). Defendant seeks reversal of his conviction for aggravated murder. In the alternative, he asks this court to vacate his sentence of death. We affirm the judgment of conviction and the sentence of death.

### FACTS

■    The jury found defendant guilty. We therefore view the evidence in the light most favorable to the state. *State v. McDonnell*, 313 Or 478, 480, 837 P2d 941 (1992).

On October 19, 1991, Larry Moyer drove his friend Shannon Faith to a place north of Coos Bay, from where Faith intended to hitchhike to Eugene. On that date, defendant, Travis Allison, and Troy Johnson were traveling in the Coos Bay area in a truck driven by defendant. Defendant displayed a knife to Johnson. Defendant and Allison discussed not having enough money for gas. The three men decided to drive to the nearby sand dunes. On the way, they saw Faith hitchhiking and offered her a ride. Faith agreed to accompany the men to the dunes. Between 3:00 and 5:00 p.m., the group drove to Johnson's house in Coos Bay. Johnson and Allison remained at Johnson's house.

About 7:30 p.m., defendant and Faith went to Larry Moyer's house in defendant's truck. Faith introduced defendant to Moyer. Faith told Moyer that she was going to Eugene with defendant. Moyer tried to talk her out of leaving and wrote down defendant's name and truck license number. Moyer observed empty beer cans in the truck and noticed that Faith was slurring her words and was unable to walk straight. Faith and defendant left.

On October 20, about 5:30 a.m., defendant returned to Johnson's house. When Allison asked defendant if he "got him some last night," defendant grinned. He told Allison that he had taken Faith to a friend's house. After breakfast, defendant and Allison departed for Roseburg. On the way, they stopped at a store. At that time, defendant threw his

knife into a nearby creek, telling Allison that he did not need it anymore.

About 11:30 a.m. the same day, a motorist found Faith's body in a remote wooded area about nine miles west of Drain, Oregon. The body had been rolled about five feet down an embankment overgrown with blackberry bushes. The victim was lying on her back, her legs spread somewhat apart and flexed in a "froglike position." She had on a long-sleeved shirt and some socks, but no pants or underpants. Tests of samples taken from her body revealed the presence of spermatozoa and seminal fluid in her vagina. Medical examiners later found an abrasion near the victim's perineum, as well as series of four abrasions along the inside of her thigh, about six inches from her vulva, suggestive of fingernail scratches. A criminalist who helped the medical examiner swab the victim's mouth, vagina, and rectum, in order to test for the presence of seminal fluid or sperm, testified that she was "most anxious to get some vaginal swabs since it looked like a rape had taken place since [the victim] had no pants or panties on and her legs were apart." From the location of various bloodstains, it could be inferred that the victim had not been wearing pants at the time she was stabbed. An autopsy later revealed that she had been stabbed about 37 times, on her face, neck, breasts, back, abdomen, and hands, causing her to die from loss of blood. Some of the wounds were "defensive wounds,"[1] indicating that she had tried to ward off the attack, and some of the wounds may have been inflicted at a point when she no longer was able to offer any significant resistance. Some of the wounds above and around her breasts suggested "the possibility of sexual mutilation in a perimortem or postmortem context."

The victim's pants and underpants were later found stuffed inside a tote bag that had been thrown into some blackberry bushes near the victim's body. Her pants had been turned inside out. Although the victim's legs were covered with blood, the outside of her pants had little or no blood on them. That led the state's criminologist to conclude that the victim's pants were down or off at the time of the knife attack.

---

[1] *See State v. McDonnell*, 313 Or 478, 481, 837 P2d 941 (1992) (describing nature of "defensive wounds").

Neither the victim's pants nor underpants had sperm or seminal fluid on them.

After hearing a news report that a body had been found, Moyer contacted the police and gave them defendant's name and truck license number. Soon thereafter, on seeing a picture of the victim on television and recognizing her as the hitchhiker that he, Allison, and defendant had picked up, Troy Johnson also contacted the police.

On October 21, defendant and Allison were stopped in Roseburg, where defendant was cited for violation of a city ordinance and Allison was arrested on an outstanding warrant. Later that day, the officer who stopped them discovered that defendant was a potential homicide suspect. Defendant's truck was located later by the Roseburg police, who discovered that defendant had traded it for a car.

On October 26, defendant was arrested in Oklahoma. Defendant initially admitted to having been in Oregon, but denied having owned a truck and also denied having had any contact with Shannon Faith. Defendant later admitted that he had driven the truck in Oregon. He told the police that on October 19 he had been drinking with Johnson and Allison, that they had picked up a female hitchhiker on the way to the dunes and that, after he had dropped off Johnson and Allison, he had met Moyer. He said that, about 20 minutes after he and the hitchhiker began driving to Eugene, they pulled off the road, she pulled down her pants, and they had consensual sexual relations. He denied forcing her to have sex with him at any time. He said that he and the hitchhiker then drove several more miles, that she kept turning up the radio, and that he kept turning it down. He then pulled his truck off the road to urinate and told her to get out of his truck. He stated that she grabbed his knife from the dashboard or glove box and came at him. He stated that he took the knife away from her, cutting her hand, but she continued coming at him and he kept pushing her away with the knife. He recalled making another wound that cut her throat and another wound in her back. He recalled stabbing her a total of three or four times. He stated that she fell to the ground and was having difficulty breathing and that some of her clothing came off as he dragged her to a ditch. He said he then threw her bags into the bushes and later threw his knife

into a creek and disposed of his bloody clothing in a dumpster in Roseburg. He agreed to perform a videotaped reenactment of what had happened.

The pathologist who performed the autopsy on the victim testified at trial that he had viewed defendant's videotape reenactment and found it to be inconsistent with the victim's injuries, because defendant had acted out the infliction of only a few of the victim's actual wounds.

Defendant's knife was recovered from the creek, and his clothing was recovered from a dumpster in Roseburg. The victim's bags were recovered from the bushes near where her body was found. The pants that she had been wearing on the day she died were found in one of her bags.

Defendant was indicted on two counts of aggravated murder. The first count alleged that the murder was committed intentionally in the course of and in furtherance of the crime of rape in the first degree. ORS 163.095(2)(d);[2] ORS 163.115(1)(b).[3] The second count alleged that the murder was committed intentionally in an effort to conceal the crime of rape in the first degree. ORS 163.095.[4] Defendant also

---

[2] ORS 163.095(2)(d) provides:

"As used in ORS 163.105 and this section, 'aggravated murder' means murder as defined in ORS 163.115 which is committed under, or accompanied by, any of the following circumstances:

"* * * * *

"(2)(d) Notwithstanding ORS 163.115(1)(b), the defendant personally and intentionally committed the homicide under the circumstances set forth in ORS 163.115(1)(b)."

[3] ORS 163.115(1) provides in part:

"Except as provided in ORS 163.118 and 163.125, criminal homicide constitutes murder:

"* * * * *

"(b)  When it is committed by a person, acting either alone or with one or more persons, who commits or attempts to commit any of the following crimes and in the course of and in furtherance of the crime the person is committing or attempting to commit, or during the immediate flight therefrom, the person, or another participant if there be any, causes the death of a person other than one of the participants:

"* * * * *

"(H)  Any felony sexual offense in the first degree defined in this chapter[.]"

[4] ORS 163.095(2)(e) provides:

"As used in ORS 163.105 and this section, 'aggravated murder' means

was indicted on one count of intentional murder, ORS 163.115(1)(a),[5] and two counts of rape in the first degree, ORS 163.375, *see* n 14, *infra.*

## GUILT PHASE

After the state's case-in-chief, during which the evidence summarized above was presented, defendant moved for acquittal on the charges of aggravated murder and rape in the first degree on the ground that there was not enough evidence from which a jury could find beyond a reasonable doubt that rape by forcible compulsion had occurred. The trial court denied the motion.

At the close of all the evidence, the court instructed the jury on the charged offenses and on the lesser-included crime of manslaughter in the first degree. ORS 163.118-(1)(a).[6] Defendant requested that the jury also be given a standard instruction on manslaughter in the second degree. ORS 163.125(1)(a).[7] UCrJI No. 1309. The trial court refused to give that instruction. The jury returned a verdict of guilty on all counts.

## PENALTY PHASE

Defendant made a pretrial motion "To Require The State To Disclose All Information Of Disproportionality." In that motion defendant asked that the state be required to disclose:

---

murder as defined in ORS 163.115 which is committed under, or accompanied by, any of the following circumstances:

"* * * * *

"(2)(e)  The murder was committed in an effort to conceal the commission of a crime, or to conceal the identity of the perpetrator of a crime."

[5] ORS 163.115(1)(a) provides:

"Except as provided in ORS 163.118 and 163.125, criminal homicide constitutes murder:

"(a)  When it is committed intentionally, * * *[.]"

[6] ORS 163.118(1)(a) provides:

"Criminal homicide constitutes manslaughter in the first degree when:

"(a)  It is committed recklessly under circumstances manifesting extreme indifference to the value of human life[.]"

[7] ORS 163.125(1)(a) provides:

"Criminal homicide constitutes manslaughter in the second degree when:

"(a)  It is committed recklessly[.]"

"1. The defendant's name and case number for each homicide prosecution in which a violation of ORS 163.115 and 163.095 has been filed in Douglas County for an offense occurring on or after December 6, 1984;

"2. The defendant's name, case number and county of venue for each homicide prosecution alleging violation of ORS 163.115 and 163.095 occurring on or after December 6, 1984, in the State of Oregon;

"3. The defendant's name, case number and county of venue for each homicide prosecution alleging violation of ORS 163.115 and 163.095 occurring on or after December 6, 1984, in which the defendant was convicted of at least one count of murder and at least one count of Rape I or Attempted Rape and received a sentence less than death[.]"

The prosecutor agreed to provide such information about cases from Douglas County, the venue of this prosecution. The trial court allowed defendant's motion insofar as Douglas County was concerned, but refused to order the state to provide the additional information from other Oregon counties.

In the penalty phase of the trial, the jury answered "yes" to each of the four questions set forth in ORS 163.150(1)(b),[8] and all 12 jurors agreed on the verdict. Defendant received a sentence of death for the crime of aggravated murder.[9]

---

[8] ORS 163.150(1)(b) provides:

"Upon the conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

"(A) Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result;

"(B) Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;

"(C) If raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased; and

"(D) Whether the defendant should receive a death sentence."

[9] The judgment of conviction and sentence provides in part:

"NOW THEREFORE, IT IS ADJUDGED that the Defendant, Clinton Wendell Cunningham, is convicted of the crime of Aggravated Felony Murder as charged in Count I of the indictment;

"IT IS FURTHER ADJUDGED that the Defendant, Clinton Wendell Cunningham, is sentenced to death as provided by ORS 163.150(1)(f)."

## JURY INSTRUCTION

Defendant first contends that the trial court erred in failing to give his requested jury instruction on manslaughter in the second degree. ORS 163.125. That instruction provides that a person commits the crime of manslaughter in the second degree if that person "recklessly causes the death of another person." UCrJI No. 1309.

The state argues that the trial court correctly refused defendant's requested instruction, because the jury could not rationally have found defendant guilty of manslaughter in the second degree, but innocent of manslaughter in the first degree. As noted, the trial court instructed the jury on aggravated murder and on the lesser included offenses of intentional murder and manslaughter in the first degree.

The following portion of the record illustrates the trial court's analysis of defendant's request:

"THE COURT: I intended to give the instruction on Manslaughter in the First Degree but I didn't intend to go beyond that. I don't know if you requested anything beyond that or not.

"* * * * *

"THE COURT: * * * Oh, yes, you requested Manslaughter in the Second Degree and I couldn't understand how the evidence in this case would support an instruction on Manslaughter in the Second Degree.

"[DEFENSE COUNSEL]: I understand the Court's position.

"* * * * *

"THE COURT: The difference between Manslaughter in the First Degree and Second Degree of course is the reference to under circumstances manifesting extreme indifference to the value of human life.

"It's hard for me to believe based on the evidence here from the two pathologists, both the defense and State's pathologists, about the manner in which this knifing occurred that the jury could conclude [defendant] was simply

acting recklessly but not under circumstances manifesting extreme indifference to the value of human life.

"If the jury were to find [defendant] guilty of Manslaughter in the Second Degree they would have to find he acted recklessly under circumstances not manifesting extreme indifference to the value of human life and I don't know how you could extract that from the evidence?

"[DEFENSE COUNSEL]:    I understand what the court proposes. In this type of case there are certain positions you have to take. If appellate counsel and everybody want to make hay out of them they can. This is one of those subjects. I made the request. That constitutes the record.

"THE COURT:    There is a case in Oregon called *State v. Thayer*[, 32 Or App 193, 573 P2d 758, *rev den* 283 Or 1 (1978)] * * *. [I]t was a knifing in which the Defendant had requested instructions on Manslaughter in the first, second degree and criminal negligence or Criminally Negligent Homicide.

"And in that case the victim had been stabbed more than 50 times. The Court of Appeals said you can't stab somebody that many times negligently so it's obviously not a Negligent Homicide. They said similarly Defendant's requested instruction on Manslaughter in the Second Degree was properly rejected. The undisputed fact that fifty stab wounds did not reasonably permit the inference that the stabbing was merely reckless without manifesting an extreme indifference to the value [of] human life.

"That's the reasoning I was using here. The pathologists both State's and defenses pathologists, indicated that there was multiple defense wounds, she was trying to ward off the attack and that the stabs were numerous and that the pattern of the stabs indicated she was continued to be stabbed after she was comatose or probably no longer capable of resisting.

"That would seem to mean there was an extreme indifference of human life particularly in view of Dr. Brady's testimony this morning that the kind of wounds he saw in this case the person would have to know what they were doing and have to have intended to cause the injuries they were causing.

"So they just couldn't be doing it recklessly without an indifference to the value of human life.

"I think a Jury's verdict of Manslaughter in the Second Degree in view of the evidence in this case is kind of laughable, don't you?

"[DEFENSE COUNSEL]: As I say, I made the request. The court will not give the instruction. That constitutes whatever record during the appeal that may be needed."

■■ Defendant argues on review that he was entitled to the instruction, because manslaughter in the second degree is a lesser-included offense of intentional murder and manslaughter in the first degree. He relies on ORS 136.460 and 136.465,[10] and on the Eighth and Fourteenth Amendments to the Constitution of the United States.[11] This court reviews the refusal to give a lesser included jury instruction for errors of law. *See generally State v. Isom*, 313 Or 391, 406-08, 837 P2d 491 (1992). We first address defendant's arguments under state law. *See State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983) (explaining methodology).

In *State v. Wille*, 317 Or 487, 494, 858 P2d 128 (1993), this court stated:

"Generally, a jury may find a defendant guilty of any lesser-included offense. ORS 136.465. However, a defendant is not entitled to a jury instruction on a lesser-included offense unless there is evidence from which a jury 'could rationally find guilt of a lesser [included] offense and no guilt of the offense charged.' *State v. White*, 303 Or 333, 347, 736 P2d 552 (1987)." (Footnote omitted.)

---

[10] ORS 136.460 provides:

"Upon a charge for a crime consisting of different degrees, the jury may find the defendant not guilty of the degree charged in the accusatory instrument and guilty of any degree inferior thereto or of an attempt to commit the crime or any such inferior degree thereof."

ORS 136.465 provides:

"In all cases, the defendant may be found guilty of any crime the commission of which is necessarily included in that with which the defendant is charged in the accusatory instrument or of an attempt to commit such crime."

[11] The Eighth Amendment provides:

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

The Fourteenth Amendment provides in part:

"[N]or shall any State deprive any person of life, liberty, or property, without due process of law[.]"

The only difference between the instructions for manslaughter in the first degree and manslaughter in the second degree is the additional requirement that for first degree manslaughter the defendant must have acted recklessly "under circumstances manifesting extreme indifference to the value of human life." ORS 163.118(1)(a).

■ A requested instruction on a lesser-included offense should be given whenever there is an evidentiary basis from which the jury could find or infer that the truth lay somewhere between the state's and the defendant's versions of the crime. *See State v. White, supra,* 303 Or at 349.

In *State v. Washington,* 273 Or 829, 835-36, 543 P2d 1058 (1975), this court stated that either the defense or the prosecution may ask that the jury be instructed as to lesser offenses that are included either in the statutory framework defining the greater and lesser offenses or in the accusatory instrument itself. The court went on to say:

> "The single limitation on the right of either the prosecution or the defendant to request lesser included offense instructions under these statutes is that there must be evidence, or an inference which can be drawn from the evidence, which supports the requested instruction so that the jury could rationally and consistently find the defendant guilty of the lesser offense and innocent of the greater." *Id.* at 836 (citations and footnote omitted).

*See also State v. White, supra,* 303 Or at 348 ("For some 44 years now this court has interpreted ORS 136.465 (and its forerunners) to require that there be evidence before the jury can consider guilt of a lesser included offense and only if that rationally can be done.");[12] *State v. Wille, supra,* 317 Or at 494 (same).

Although defendant requested an instruction on manslaughter in the second degree, he could provide the trial court with no explanation of how the evidence would support

---

[12] Applying ORS 136.465 as interpreted by *State v. White,* 303 Or 333, 736 P2d 552 (1987), in *State v. Isom,* 313 Or 391, 407-08, 837 P2d 491 (1992), this court determined that no lesser-included offense instruction on intentional murder was warranted when there was no dispute as to the existence of the aggravating factor (defendant's status as an escapee). A similar conclusion was reached in *State v. Farrar,* 309 Or 132, 167-68, 786 P2d 161 *cert den sub nom Oregon v. Wagner,* 498 US 879 (1990), where the evidence of the murder and of the underlying felonies (burglary of the victim's home and robbery of the victim) was essentially undisputed.

it. Defense counsel's only explanation for requesting the instruction was the following:

"[DEFENSE COUNSEL]: * * * In this type of case there are certain positions you have to take. If appellate counsel and everybody want to make hay out of them they can. This is one of those subjects. I made the request. That constitutes the record.

"* * * * *

"[DEFENSE COUNSEL]: As I say, I made the request. The court will not give the instruction. That constitutes whatever record during the appeal that may be needed."

From the foregoing, it is difficult to see how any issue has been preserved for appeal. However, and even if we give defendant the benefit of the doubt as to preservation, undisputed evidence in the record showed that, if defendant killed the victim "recklessly," he did so under circumstances manifesting an extreme indifference to the value of human life, thereby establishing that he committed the crime of manslaughter in the first degree. Because the jury could not rationally have found defendant guilty of manslaughter in the second degree, but innocent of manslaughter in the first degree, the trial court did not err in refusing to give defendant's requested instruction.

This court addressed a similar question about jury instructions on lesser-included offenses in *State v. Farrar,* 309 Or 132, 167-68, 786 P2d 161, *cert den sub nom Oregon v. Wagner,* 498 US 879 (1990). In *Farrar,* the defendant was charged with four counts of aggravated murder based on underlying felonies of robbery and burglary. The evidence in that case showed that the victim was found dead inside her residence, that a window had been broken, and that rooms had been ransacked. *Id.* at 152. Physical evidence connected the defendant to the scene of the crime. *Id.* at 154. The defendant requested at trial that the jury be instructed on the lesser-included offense of murder. The trial court refused to give that instruction. *Id.* at 167. After citing *State v. White, supra,* this court agreed with the trial court:

"The evidence in this record does not rationally support a verdict of guilty of simple murder and an acquittal on the aggravated murder charges. We cannot conceive of any coherent reason for giving the lesser included instruction on

simple murder. The entire case was founded on a murder committed during a burglary of the victim's home and a robbery of the victim. On this record the jury could not have rationally found that the killing was unrelated to any of the four categories." *State v. Farrar, supra,* 309 Or at 168.

This court has in the past interpreted the phrase "circumstances manifesting extreme indifference to the value of human life" in the context of statutes of the various degrees of assault. In *State v. Boone,* 294 Or 630, 633-34, 661 P2d 917 (1983), this court stated:

"These statutes [defining the four culpable mental states of intentional, knowing, reckless and criminally negligent] define neither extreme indifference to the value of human life nor the circumstances which may manifest such indifference. In the absence of a definition we determine the extreme indifference language does not create an additional culpable mental state. The language does, however, require more than recklessness. We conclude that the jury must find not only recklessness, but also conduct which in addition to recklessness, manifests extreme indifference to the value of human life on the part of this defendant, as may be inferred from his conduct at the time of the event."[13] (Footnote omitted.)

Those observations also apply to the phrase "under circumstances manifesting extreme indifference to the value of human life" in ORS 163.118(1)(a). Thus, the question here is whether the jury could rationally have found defendant to be reckless without inferring from all the evidence that he manifested an extreme indifference to human life. We agree with the trial court that the evidence in this record could not rationally support a verdict of guilty of manslaughter in the second degree.

As noted, the autopsy in this case showed that the victim had been stabbed about 37 times. Defendant admitted that he stabbed the victim three or four times, that she had a

---

[13]

"The statute as drafted does not accurately state what we perceive to be its meaning. It is not the 'circumstances' that manifest extreme indifference but rather it is the conduct of a defendant that manifests his or her extreme indifference. Whether a defendant's conduct manifests extreme indifference must be determined from all the circumstances surrounding the conduct." *State v. Boone,* 294 Or 630, 634 n 8, 661 P2d 917 (1983).

lot of blood on her, and that she was having difficulty breathing. After observing the victim's difficulty in breathing, defendant dragged her into a ditch and left. At trial, defendant did not challenge the accuracy of the physical evidence presented by the state or dispute that he was responsible for all of the wounds inflicted on the victim; his statements to the police simply indicated that he did not remember stabbing the victim more than three or four times. Although the assessment of circumstances surrounding a defendant's conduct usually should be left to the jury when the circumstances are in dispute, in this case it was not necessary to do so, because a jury could not rationally have found that defendant acted recklessly and that his conduct did not manifest extreme indifference to the value of human life.

■ Defendant's argument that the trial court's refusal to instruct on manslaughter in the second degree violated the Eighth and Fourteenth Amendments fails for the same reason. Because there was no evidentiary basis for instructing the jury as to manslaughter in the second degree, the trial court's ruling did not violate defendant's rights under the federal constitution. *See State v. Isom, supra,* 313 Or at 408 (because there was no evidentiary basis for the requested lesser-included offense instruction, trial court's refusal to give the instruction did not violate the Eighth Amendment).

The trial court did not err in failing to give defendant's requested instruction on manslaughter in the second degree. *State v. Wille, supra; State v. White, supra; State v. Washington, supra.*

## MOTION FOR JUDGMENT OF ACQUITTAL

Defendant contends that the trial court erred in denying his motion at the close of the state's case for a judgment of acquittal on the charges of aggravated murder and rape in the first degree.[14] He argues that the evidence

---

[14] ORS 163.375(1) provides in part:

"A person who has sexual intercourse with another person commits the crime of rape in the first degree if:

"(a) The victim is subjected to forcible compulsion by the person[.]"

ORS 163.305(2) provides in part:

" 'Forcible compulsion' means physical force that overcomes earnest resistance; or a threat, express or implied, that places a person in fear of immediate or future death or physical injury to self or another person * * *."

presented was insufficient for a rational trier of fact to conclude beyond a reasonable doubt that he committed rape in the first degree. He also argues that there was no direct evidence of a rape.[15]

The trial court stated:

"THE COURT: * * * The rule in Oregon is set by statute. I think the rule is that a Judgment of Acquittal is appropriate if the evidence is insufficient to support a verdict.

"So the question is viewing the evidence in the light most favorable to the State at this juncture whether or not the jurors could reasonably conclude the evidence establishes beyond a reasonable doubt that the crime of Rape in the First Degree occurred.

"And I have concluded that if you look at all of the evidence that's been presented so far, not isolating any particular aspect, looking at it in total, that the evidence is sufficient to support a jury's verdict.

"And I am not going to recite all that evidence but I would simply state that it includes the homicide obviously, the manner in which the homicide occurred. The place and time, the state of undress of the victim, the presence of seminal fluid, the vaginal abrasion, and there are other things of course.

"The only evidence I know of at this juncture that would suggest anything other than a forcible rape is the Defendant's own statement to the police that she had consensual sex with him at a time and place earlier up the road. Of course the jury has the right to disregard that as a self-serving statement.

"I think considering the nature and violence of the attack on the victim and the — her appearance without any underclothing or anything would suggest that something of a violent nature occurred to her. And that coupled with the vaginal abrasion would suggest perhaps a forcible rape. I

---

[15] Defendant does not argue that the evidence was insufficient to support a finding that he was responsible for killing the victim. In addition to producing overwhelming circumstantial evidence of defendant's guilt, the state produced evidence that defendant had confessed to stabbing the victim, and the jury viewed a videotape in which defendant reenacted the killing. In closing argument, defense counsel admitted that there was no "serious dispute that [defendant] was responsible" for his victim's death.

think the evidence is sufficient at this point to support a jury verdict. The motion for Judgment of Acquittal is denied."

██ This court reviews questions of the sufficiency of the evidence in a criminal case following a conviction by examining the evidence in the light most favorable to the state to determine whether a rational trier of fact, accepting reasonable inferences and reasonable credibility choices, could have found the essential element of the crime beyond a reasonable doubt. *State v. Langley*, 314 Or 247, 267-68, 839 P2d 692 (1992). This court's decision is not whether we believe that defendant is guilty beyond a reasonable doubt, but whether the evidence is sufficient for the jury to so find. *State v. Rose*, 311 Or 274, 281, 810 P2d 839 (1991); *State v. King*, 307 Or 332, 339, 768 P2d 391 (1989). This court has rejected the argument that circumstantial evidence may never be sufficient to convict. *State v. Williams*, 313 Or 19, 24, 828 P2d 1006, *cert den* ___ US ___, 113 S Ct 171 (1992). For purposes of analyzing the sufficiency of evidence, there is no distinction between direct and circumstantial evidence as to the degree of proof required. *State v. Lerch*, 296 Or 377, 396, 677 P2d 678 (1984).

█ Viewing the evidence in the record to which we have alluded earlier in this opinion, in the light most favorable to the state, including defendant's admissions, we conclude that a rational trier of fact could have found beyond a reasonable doubt the elements of the crime of first degree rape and that defendant personally and intentionally committed the homicide in the course of and in furtherance of rape in the first degree. *See State v. Rogers*, 313 Or 356, 386-87, 836 P2d 1308 (1992), *cert den* ___ US ___, 113 S Ct 1420 (1993) (sexual mutilation supported finding that defendant had killed victim in course of sexually abusing her); *State v. Williams, supra*, 313 Or at 26 (evidence that murder victims were nude from waist down, had hands bound behind backs and were lying on backs, supported finding that defendant attempted first degree sexual abuse).

Defendant argues that the evidence is insufficient because it is circumstantial. Circumstantial evidence, however, is admissible to prove a crime. *State v. Lerch, supra*.

Defendant next argues that the evidence is insufficient, because he offered an alternative, less incriminating,

version of what happened, *i.e.*, that he had had consensual sexual relations with the victim at a different time and place than he killed her. The jury, however, was not required to accept defendant's version of what had happened. *State v. Rose, supra*, 311 Or at 284.

We conclude that the evidence in the record to which we have alluded earlier in this opinion was sufficient to permit a rational trier of fact to have found beyond a reasonable doubt that defendant raped and murdered the victim. The evidence was sufficient to support defendant's convictions on the charges of aggravated murder and rape in the first degree. *State v. Rogers, supra*; *State v. Williams, supra*; *State v. Rose, supra*; *State v. King, supra*.

The trial court did not err in denying defendant's motion for a judgment of acquittal on the charges of aggravated murder and rape in the first degree.

## PLEA NEGOTIATIONS AND SENTENCE REVIEW

Defendant contends that the trial court erred in denying his motion to require the state to produce the results of other jury verdicts in all capital cases for purposes of a "proportionality review."[16] As noted, the state voluntarily produced that information for Douglas County, the venue of this case. The trial court denied defendant's motion for additional information from other Oregon counties.

The reasons that defense counsel gave the trial court for seeking the additional statewide information were that it pertained to "the possibility of resolving the case without a trial" and that it was needed to give the jury "some idea of what goes on in the world so they don't focus exclusively on one case." We understand defendant's reason for asking for the statewide information so that he could make a comparison of the sentences of similarly situated defendants charged with aggravated murder throughout Oregon to determine whether he was unfairly denied a particular plea offer or sentence. Noting that some states have statutes that require

---

[16] We continue to question the propriety of using the term "proportionality review" to identify the process in which defendant wanted to engage here. *See State v. McDonnell, supra*, 313 Or at 493 (raising the question).

some sort of "proportionality review" to be carried out either at trial or on appeal, he argued that the *jury* should be able to consider information about the disposition of other factually similar cases in Oregon where defendants were charged with similar crimes and received life sentences rather than the death penalty.[17]

Defendant argues that he was entitled to the statewide information under Article I, section 20, of the Oregon Constitution, and under the Eighth and Fourteenth Amendments to the Constitution of the United States, set out *supra* at note 11. Because defendant cites no statutory basis for the statewide information and we find none, we turn to the issue of whether defendant was entitled to the information under Article I, section 20.

## A. Article I, section 20

■    Article I, section 20, of the Oregon Constitution, provides:

> "No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."

This court has dealt with somewhat similar "proportionality" arguments in terms of prosecutors' choices whether or not to enter into plea negotiations with certain defendants. *See, e.g., State v. McDonnell, supra*, 313 Or at 493; *State v. Farrar, supra*, 309 Or at 138-42. In *Farrar*, this court stated, "we assume that standardless or irrational plea bargaining or a refusal to plea bargain for an improper purpose would be a governmental act within Article I, section 20." 309 Or at 139. This court went on to state:

> "Assuming the 'privilege or immunity' clause involves plea bargaining or the prosecution's willingness to enter into a plea agreement, the appropriate persons for the analysis of disparate treatment are those who have been charged in Marion County with aggravated murder * * *." *Id.* at 140.

---

[17] Defendant did not ask the trial court to undertake any "proportionality review."

Defendant argues for the first time on review that he "could have used the statewide information to ask the trial court to undertake a proportionality review." Defendant did not make that argument in the trial court. This court therefore will not consider it. ORAP 5.45(2).

In *Farrar*, the court found no violation of Article I, section 20, where the district attorney's decision was "not based on class discrimination, animus to defendant or his attorney, or on concerns collateral to fair prosecution of defendant for aggravated murder." *Id.* at 141. In *State v. McDonnell, supra*, 313 Or at 493, this court declined the defendant's invitation to attempt to inquire into the proportionality or the availability of plea bargaining.

In *State v. Buchholz*, 309 Or 442, 444, 788 P2d 998 (1990), the defendant asserted that a district attorney's failure to offer the same plea bargain to the defendant as had been offered to a codefendant violated the privileges and immunities clause of Article I, section 20. This court stated:

> "[E]ven when a decision rests within the discretion of the district attorney, that decision is subject to judicial scrutiny. *State v. Freeland*[, 295 Or 367, 370, 667 P2d 509 (1983)]. On the other hand, the mere presence of discretion does not necessarily present any inherent section 20 problems, *id.* at 371, so long as the exercise of discretion 'adheres to sufficiently consistent standards to represent a coherent, systematic policy.' *Id.* at 375. Stated differently, the exercise of discretion meets the constitutional standard if 'made by permissible criteria and consistently applied.' *Id.* at 377." *State v. Buchholz, supra*, 309 Or at 446-47.

The court went on to hold that ORS 135.405(4), which provides that similarly situated defendants should be given equal plea bargaining opportunities, represented a coherent, systematic policy. *Id.* at 445, 447.

In the present case, one of the reasons why defense counsel sought the statewide information on other defendants charged with aggravated murder was to establish that similar cases were resolved by plea agreement. Again, as in *Farrar*, we assume that standardless or irrational prosecutorial decisions on whether to plea bargain would violate Article I, section 20. However, as noted in *Farrar*, whether such standardless or irrational prosecutorial decisions have been made is determined by comparing a defendant's situation with the situation of others who have been charged with the same crime in the same county. 309 Or at 140. In the present case, the state provided the requested information pertaining to other defendants in Douglas County. Defendant

does not argue that he has been treated differently than other similarly situated defendants in Douglas County. Defendant cites no authority, and we are aware of none, for the proposition that the appropriate persons for the analysis of disparate treatment in plea bargaining or sentencing are those persons charged with identical crimes in all of the state's other counties, outside the venue of defendant's prosecution. Because he received the Douglas County information, defendant received the information relevant to making an Article I, section 20, challenge to the prosecutor's plea negotiations in this case. For the same reasons, we conclude that defendant's invitation for this court, or the trial court, or the jury, to attempt to engage in statewide comparative sentence review should be rejected. *See State v. Montez*, 309 Or 564, 607, 789 P2d 1352 (1990) ("federal constitution does not require comparative sentence review of state death penalties"); *State v. Wagner*, 305 Or 115, 169-70, 752 P2d 1136 (1988), *vacated on other grounds* 492 US 491 (1989) (comparative sentence review not required by Oregon Constitution) Defendant has failed to establish that he has an Article I, section 20, right to a review of the kind he seeks here.

## B. Eighth Amendment

Defendant asks this court to declare that a "proportionality review of death sentences" is required under the Eighth Amendment, made applicable to the states through the Fourteenth Amendment to the Constitution of the United States, and that the state is required by the Fourteenth Amendment's Due Process Clause to provide information pertinent to the proportionality inquiry. In support of his argument, defendant cites *Brady v. Maryland*, 373 US 83, 83 S Ct 1194, 10 L Ed 2d 215 (1963).

Defendant concedes that, in *Pulley v. Harris*, 465 US 37, 104 S Ct 871, 79 L Ed 2d 29 (1984), the United States Supreme Court rejected the idea that proportionality review of death sentences is required under the Eighth Amendment. As noted by the Court in that case:

> "This sort of proportionality review presumes that the death sentence is not disproportionate to the crime in the traditional sense. It purports to inquire instead whether the penalty is nonetheless unacceptable in a particular case

because disproportionate to the punishment imposed on others convicted of the same crime." 465 US at 43.

Noting a number of cases in which proportionality review "was considered to be an additional safeguard against arbitrarily imposed death sentences," *id.* at 50, the Supreme Court said that it relied not on this point, but on "the constitutionally necessary narrowing function of statutory aggravating circumstances" found by a factfinder, to determine whether there had been a violation of the Eighth Amendment. *Ibid.* Although recognizing that apparently some states by statute require proportionality review of death sentences, *id.* at 44, the Court concluded that a state sentencing system does not violate the Eighth Amendment merely because it is "without any requirement or practice of comparative proportionality review." *Id.* at 53; *see also State v. Montez, supra,* 309 Or at 607 (citing *Pulley v. Harris, supra,* and rejecting claim that proportionality review was required under federal constitution). Defendant was not entitled to proportionality review of death sentences. *Pulley v. Harris, supra.*

## C. *Fourteenth Amendment*

We next turn to the question whether defendant had a Fourteenth Amendment due process right to obtain the statewide information for the reasons stated in his motion. Defendant concedes that his argument that he is entitled to this information under *Brady v. Maryland, supra,* is based on the premise that the statewide information is material, because he is entitled to a statewide comparative sentence review. Because defendant has failed to establish that he is entitled to a statewide comparative sentence review, he likewise has failed to establish that the statewide information he seeks for that review is "material" to punishment under *Brady v. Maryland. See State v. McDonnell, supra,* 313 Or at 493 (same analysis applied under Equal Protection Clause of Fourteenth Amendment).

Defendant has no federal constitutional right to obtain statewide information about similarly situated defendants throughout Oregon from the prosecution for use in his aggravated murder trial. *State v. McDonnell, supra; State v. Farrar, supra.*

The trial court did not err in denying defendant's motion to require the state to produce the results of other jury verdicts in capital cases.

## CONCLUSION

We have considered each of defendant's guilt- and penalty-phase assignments of error and every argument advanced in support thereof. Any assignment or argument not discussed in this opinion either has been considered and rejected by the court in previous death penalty appeals or is not well taken. Discussion of them would not benefit the bench or bar. We find no error based on those assignments and arguments.

The judgment of conviction and sentence of death are affirmed.

**UNIS, J.,** concurring in part and specially concurring in part.

I join in the opinion of the court, except for its holding that "[t]he trial court did not err in failing to give defendant's requested [jury] instruction on manslaughter in the second degree." 320 Or at 61. In my view, defendant was entitled to have the jury instructed on the lesser-included crime of manslaughter in the second degree. Nevertheless, I would hold that the failure to instruct on that lesser-included crime was harmless error.

Defendant requested that the following instruction be given to the jury:

"MANSLAUGHTER IN THE SECOND DEGREE —
RECKLESS CONDUCT

"Oregon law provides that a person commits the crime of manslaughter in the second degree if that person recklessly causes the death of another person.

"In this case, to establish the crime of manslaughter in the second degree, the state must prove beyond a reasonable doubt the following three elements:

"(1)  The act occurred in _____ County, Oregon;

"(2) The act occurred on or about _____, 19___; and

"(3)    [Defendant's name] recklessly caused the death of [name of decedent]." UCrJI No. 1309.

"The right to an instruction on a lesser-included offense springs from statute." *State v. White*, 303 Or 333, 346, 736 P2d 552 (1987). ORS 136.465 provides:

"In all cases, the defendant may be found guilty of any crime the commission of which is necessarily included in that with which the defendant is charged in the accusatory instrument or of an attempt to commit such crime."[1]

This court has interpreted ORS 136.465 (and its forerunners) to require a two-step analysis before a defendant is entitled to a jury instruction on a lesser-included crime that has not been alleged in the charging instrument. First, the crime on which the instruction is sought must be included in the one charged. Second, the evidence must be such that a jury, rationally and consistently, could find the defendant guilty of the lesser crime, but not the greater (*i.e.*, the crime charged). *State v. Wille*, 317 Or 487, 494, 858 P2d 128 (1993); *State v. White, supra*, 303 Or at 346-48; *State v. Washington*, 273 Or 829, 836, 543 P2d 1058 (1975).

There is no dispute in this case that manslaughter in the second degree is a lesser-included crime of intentional murder and of manslaughter in the first degree. The difference in proof required for manslaughter in the first degree, compared with the lesser-included crime of manslaughter in the second degree, is that manslaughter in the first degree requires proof that the criminal homicide was "committed recklessly under circumstances manifesting extreme indifference to the value of human life," ORS 163.118(1)(a), while manslaughter in the second degree requires proof that the criminal homicide was "committed recklessly," ORS 163.125(1)(a).

In this case, the trial court instructed the jury on the charged crimes of aggravated murder, murder, rape in the first degree, and the lesser-included crime of manslaughter in

---

[1] ORS 136.460 provides:

"Upon a charge for a crime consisting of different degrees, the jury may find the defendant not guilty of the degree charged in the accusatory instrument and guilty of any degree inferior thereto or of an attempt to commit the crime or any such inferior degree thereof."

the first degree. The trial court refused, however, to give defendant's requested jury instruction on manslaughter in the second degree, stating that the evidence did not support such an instruction because, to find that crime, the jury would have to conclude that defendant had acted recklessly under circumstances that did not manifest an extreme indifference to the value of human life. The trial court reasoned, and the majority of this court agrees, that the evidence in this case could not rationally support such a conclusion. 320 Or at 60. I disagree.

A person acts recklessly if that person is aware of and consciously disregards a substantial and unjustifiable risk that either (1) a particular result will occur, or (2) a particular circumstance exists. ORS 161.085(9). "The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation." *Id.*

In *State v. Boone*, 294 Or 630, 633-34, 661 P2d 917 (1983), this court observed that the Oregon Criminal Code does not define the concept of "extreme indifference to the value of human life." The *Boone* court stated that "the extreme indifference language does not create an additional culpable mental state," but that such language does "require more than recklessness." *Id.* "[T]he jury must find not only recklessness but also conduct which in addition to recklessness, manifests extreme indifference to the value of human life on the part of [the] defendant, as may be inferred from his conduct at the time of the event." *Id.* Whether a defendant's conduct manifests extreme indifference to the value of human life must be determined from all the circumstances surrounding the conduct. *Id.* at 634 n 8.

In this case, there was a conflict in the evidence as to exactly what defendant's actions were. The jury should have been permitted to determine from all the circumstances surrounding defendant's conduct whether the homicide was committed only recklessly. In my view, the jury rationally and consistently could have found defendant to be reckless without inferring from all the evidence that he manifested an extreme indifference to the value of human life.

Having determined that failure to give the lesser-included instruction on manslaughter in the second degree was error, the next inquiry is to determine whether that error requires reversal of all of defendant's convictions.

ORS 138.230 provides:

> "After hearing the appeal, the court shall give judgment, without regard to the decision of questions which were in the discretion of the court below or to technical errors, defects or exceptions which do not affect substantial rights of the parties."

This court has stated that a substantial right of a party is not affected if there is (1) "substantial and convincing evidence of guilt" and (2) "little, if any, likelihood that the error affected the verdict." *State v. Miller*, 300 Or 203, 220-21, 709 P2d 225 (1985). This test of when a substantial right of a party is affected is consistent with the standard for reversible error set forth in Article VII (Amended), section 3, of the Oregon Constitution. *Id.* at 221. In *State v. Hansen*, 304 Or 169, 180, 743 P2d 157 (1987), this court declared that both criteria of the test of when a substantial right of a party is affected are fully expressed by the second criterion. The issue, then, is whether there is "little likelihood" that the failure to give the lesser-included instruction on manslaughter in the second degree "affected the verdict."

In this case, the jury was instructed on the culpable mental state required to convict defendant of the charged crimes of aggravated murder, murder, and first degree rape. The jury was also instructed on the culpable mental state of "recklessly," as required for manslaughter in the first degree. By finding defendant guilty of aggravated murder under ORS 163.095(2)(d), the jury *necessarily* found that defendant had "personally and *intentionally* committed the homicide."[2] (Emphasis added.)

The jury did not find defendant guilty of the lesser-included crime of manslaughter in the first degree, which

---

[2] ORS 161.085(7) provides:

" 'Intentionally' or 'with intent,' when used with respect to a result or to conduct described by a statute defining an offense, means that a person acts with a conscious objective to cause the result or to engage in the conduct so described."

required the lesser culpable mental state of recklessness. As noted by this court in *State v. Boone, supra*, 294 Or at 633-34, there is only one culpable mental state of recklessness; the phrase "extreme indifference to the value of human life" does not create an additional culpable mental state. By determining that defendant acted intentionally, the jury necessarily rejected the notion that defendant acted only "recklessly," whether or not he acted with "extreme indifference to the value of human life."

In these circumstances, and based on the facts of record, I believe that there was little, if any, likelihood that the trial court's failure to give the instruction on the lesser-included crime of manslaughter in the second degree affected the jury's verdict. I, therefore, conclude that the trial court's refusal to give the requested lesser-included instruction on manslaughter in the second degree was harmless error. Moreover, assuming, without deciding, that the trial court's failure to instruct the jury as to manslaughter in the second degree is constitutional error as well as statutory error, that error would not require reversal under the federal constitution. *See Sullivan v. Louisiana*, ___ US ___, 113 S Ct 2078, 124 L Ed 2d 182, 189 (1993) (stating federal constitutional harmless error standard); *Yates v. Evatt*, 500 US 391, 403, 111 S Ct 1884, 114 L Ed 2d 432 (1991) (same); *Chapman v. California*, 386 US 18, 23-24, 87 S Ct 824, 17 L Ed 2d 705 (1967) (same).

Durham, J., joins in this opinion.

**FADELEY, J.,** dissenting.

In the first case to reach the Supreme Court of the United States under Oregon's 1984 death penalty statute, that court vacated the death sentence imposed because of constitutional defects in Oregon death penalty statute and remanded the case to that court. *Wagner v. Oregon*, 492 US 914, 109 S Ct 3235, 106 L Ed 2d 583 (1989).

I. STANDARDLESS, UNREVIEWABLE DEATH QUESTION

In 1991, the legislature amended the statute in the terms used by the majority in *State v. Wagner*, 309 Or 5, 786 P2d 93 (1990) (*Wagner II*). Or Laws 1991, ch 885, § 2. The statute so enacted also is constitutionally defective, in my

view. One example of such a defect is the open ended, standardless question added after *Wagner v. Oregon, supra,* was decided. The "fourth question," added by legislation, simply asks the jury to answer "yes" or "no" to the query whether "defendant should" receive the death sentence. ORS 163.150(1)(b)(D).[1] The statute spells out what instructions must be given to the jury concerning their answer to the death question. They are to answer it "no" only if they find circumstances that one or more "believe would justify a sentence less than death."

## A. *Standardless*

Neither the judicial nor the later legislative amendment to the statute includes standards to be applied in answering that question.[2] The question simply asks the jury's opinion. Unless one or more of the jury find as fact that it believes "no" is the answer, then "yes" is the answer to the "fourth" question. When "yes" is the answer, that's it; the death penalty must follow. No court has any discretion in that penalty scheme. The state law does not permit either judicial review or judicial modification of the substance of the penalty imposed by that answer.

Thus, in one county, aggravated murder defendants may all be subjected to the death penalty while crimes of the same magnitude are usually disposed of by life sentence without parole, at either the prosecutorial or jury verdict level, in another county.

## B. *Unreviewable*

The resulting lack of judicial review of the penalty imposed under Oregon's standardless "fourth" question is

---

[1] In *State v. Wagner,* 305 Or 115, 233, 235, 752 P2d 1136 (1988) (*Wagner I*) (Gillette, J., joined by Linde, J., dissenting), the deficiency still present in the statute that permits the jury to answer open-ended questions without directing them to the standards to be applied is pointed out. That deficiency still exists in spades leaving the death decision made here without due process, a grave matter indeed.

[2] The statute requires that the jury be *instructed to answer the question on the basis* of what "one or more of the jurors believe would justify a sentence less than death." ORS 163.150(1)(c)(B). The jurors are instructed, in forming their "belief," to consider the circumstances of the offense and defendant's character and background. *Ibid.* It appears from the *phrasing* of the question that the jury is expected to answer "yes" for death unless the defendant carries a burden of producing evidence that impacts a juror's belief to the contrary.

the same as the lack of judicial review, or power to modify, that the Supreme Court of the United States has held in another context to violate the Due Process Clause of the Fourteenth Amendment. *See Oberg v. Honda Motor Co.*, 316 Or 263, 275, 851 P2d 1084 (1993), *rev'd* ___ US ___, 114 S Ct 2331, 129 L Ed 2d 336 (1994) (requiring that appellate review of punitive damage award be made available as matter of Fourteenth Amendment due process); *Pacific Mut. Life Ins. Co. v. Haslip*, 499 US 1, 111 S Ct 1032, 113 L Ed 2d 1 (1991) (due process requires post-verdict review including power to modify the extent or degree of the verdict).

No doubt there is as much an "acute danger of arbitrary deprivation" of life as there is of "property" to which the Supreme Court spoke in *Oberg*. ___ US at ___. A punitive verdict ending a life is entitled to the same due process as must be applied to money damage verdicts. The standardless death question, and the lack of any review in Oregon of the answer a jury chooses to give to that question, are as lacking in due process and, therefore, as unconstitutional as the punitive damages awards overturned in *Haslip* and *Oberg*.

There are those who will argue that due process applied only to property interests in 1867 when the Fourteenth Amendment's due process guarantees were adopted, not to the liberty interest of persons. What a callous disregard that would be of the reality that the Fourteenth Amendment was one of three contemporaneous amendments that transformed the legal status of former slaves from that of property to that of persons entitled to protection of their individual liberty interests as human beings. What a distortion of the reality of the constitutional changes based on the 19th century's concept of civilization's first principles and the outcome of the civil war it would be to say that the liberty interest protected by the Fourteenth Amendment extends to incarceration but not execution.

Whether or not death penalties have been subject to judicial review and modification historically, it is difficult to think of a human interest more worthy of due process protection than human life. And the reforms in the middle 1800's changed the purposes of punishment to reformation and required penalties proportional to offenses at the time of

adoption of the Fourteenth Amendment's Due Process Clause. *See* Article I, sections 15 and 16, of Oregon's Constitution of 1857 (so providing).

   *Tuilaepa v. California* and *Proctor v. California*, ____ US ____, 114 S Ct 2630, 129 L Ed 2d 750 (1994), provide further support questioning the adequacy of Oregon's "fourth" question and accompanying instruction. In California, the jury must, as in Oregon, find one or more of the statutorily prescribed special circumstances to be present in relation to the homicide that aggravate the murder before the defendant is even eligible for the death penalty. But that verdict, determining death eligibility, neither imposes the death penalty nor escapes post-verdict judicial review for due process purposes in California, unlike in Oregon where the answer to the standardless question escapes due process review.

   After a finding of aggravating circumstances determines death eligibility, another California statute then requires a separate inquiry by the jury, an inquiry that selects, from among those eligible, which ones shall be executed, as also does the Oregon scheme. However, in making that selection in California, the jury does *not* decide whether defendant "should" be put to death. Instead it decides whether one or more of the fact-based, statutorily specified factors exist. The factors are much more specific than was the question in *Wagner II* and the question copied from it in ORS 163.150(1)(b)(D). And they are generally of a more factual nature in California, not an open-ended inquiry as to "beliefs" about execution as in Oregon. Neither of those — judicial review nor the requirement for fact-based findings — processes or safeguards exists in Oregon.

   Significant is the difference between the California scheme, that barely passed muster in *Tuilaepa v. California, supra*, and the Oregon scheme. A major difference is found in the automatic and mandatory judicial review of a death verdict at both the trial and appellate levels.

   California Penal Code section 190.4(e) states:

> "In every case in which the trier of fact has returned a verdict or finding imposing the death penalty, the defendant shall be deemed to have made an application for modification

of such verdict or finding pursuant to Subdivision 7 of Section 11. In ruling on the application, the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings.

"The judge shall set forth the reasons for his ruling on the application and direct that they be entered on the Clerk's minutes. The denial of the modification of the death penalty verdict pursuant to subdivision (7) of Section 1181 shall be reviewed on the defendant's automatic appeal pursuant to subdivision (b) of Section 1239. The granting of the application shall be reviewed on the People's appeal pursuant to paragraph (6)."

But, no judicial review of the penalty as such is even *permitted* in Oregon. No judicial power exists to modify the penalty on its own merits in Oregon, unlike the California scheme approved in *Tuilaepa*. The due process principles and requirements announced in *Haslip* and *Oberg,* when applied to the Oregon death decision scheme, dictate that a death penalty assessed by a jury here must be vacated because death without due process is fundamentally unfair.

In the recent decision of the Supreme Court of the United States in *Simmons v. South Carolina*, ___ US ___, 114 S Ct 2187, 129 L Ed 2d 133 (1994) reversing a judgment of death, that Court spelled out the need for due process and a heightened standard of reliability. Although applying due process to a different question there, that Court indicates how it would apply due process to another of the questions answered by the jury in an aggravated murder case and thus, by analogy, how it would apply due process to invalidate a death decision resting on Oregon's standardless, unreviewable "fourth" question. In that case, Justice Blackmun said for the Court that:

"Where a defendant's future dangerousness is at issue, and state law prohibits his release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible."

Justice O'Connor, concurring, said:

> " 'Capital sentencing proceedings must of course satisfy the dictates of the Due Process Clause,' *Clemons v. Mississippi*, 494 U.S. 738, 746, 110 S.Ct. 1441, 1447, 108 L.Ed.2d 725 (1990), and one of the hallmarks of due process in our adversary system is the defendant's ability to meet the State's case against him. *Cf. Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 2146-2147, 90 L.Ed.2d 636 (1986). In capital cases, we have held that the defendant's future dangerousness is a consideration on which the State may rely in seeking the death penalty. *See California v. Ramos*, 463 U.S. 992, 1002-1003, 103 S.Ct. 3446, 3454, 77 L.Ed.2d 1171 (1983). But 'where the prosecution specifically relies on a prediction of future dangerousness in asking for the death penalty, . . . the elemental due process requirement that a defendant not be sentenced to death "on the basis of information which he had no opportunity to deny or explain" [requires that the defendant be afforded an opportunity to introduce evidence on this point].' *Skipper v. South Carolina*, 476 U.S. 1, 5, n. 1, 106 S.Ct. 1669, 1671, n. 1, 90 L.Ed.2d 1 (1986), quoting *Gardner v. Florida*, 430 U.S. 349, 362, 97 S.Ct. 1197, 1207, 51 L.Ed.2d 393 (1977).* * *" *Id.* at 2200.

Justice Souter, concurring in the reversal said:

> "The Eighth Amendment entitles a defendant to a jury capable of a reasoned moral judgment about whether death, rather than some lesser sentence, ought to be imposed. The Court has explained that the Amendment imposes a heightened standard 'for reliability in the determination that death is the appropriate punishment in a specific case,' *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (opinion of Stewart, Powell, and Stevens, JJ.) * * *." *Id.* at 2198.

And Justice Ginsburg said:

> "This case is most readily resolved under a core requirement of due process, the right to be heard. *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 2146-2147, 90 L.Ed.2d 636 (1986). When the prosecution urges a defendant's future dangerousness as cause for the death sentence, the defendant's right to be heard means that he must be afforded an opportunity to rebut the argument. See *Skipper v. South Carolina*, 476 U.S. 1, 5, n. 1, 106 S.Ct. 1669, 1671, n. 1, 90 L.Ed.2d 1 (1986). To be full and fair, that opportunity must include the right to inform the jury, if it is indeed the case, that the defendant is ineligible for parole." *Id.* at 2199.

Applying the criteria of the various justices yields the following result in this case. Because no one can tell what standard, if any, the Oregon jury may be using to answer the question whether they believe defendant must die, and because there is no review to be sure their answer is not excessive in the circumstances of the case, or that it is supported by law and evidence in that case, there is no meaningful right to be heard on the issue and no common agreement about what is the foundation for an individual moral or reasoned judgment. For those reasons, there is nothing to which to apply any heightened standard of reliability as to that open-ended question composed of a "should" and a "belief." Not knowing what standard, if any, will be used, defendant has no ability to meet what a juror will use to decide whether defendant "should" or "should not" be executed, nor any opportunity to deny or explain that unknown quantity.[3]

The California statute's list of factors a jury must find to impose death, provides:

"(a)   The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1.

"(b)   The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence.

"(c)   The presence or absence of any prior felony conviction.

"(d)   Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

"(e)   Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.

"(f)   Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.

---

[3] The "should" question is asked of jurors who, to remain on the jury, have already answered that they have no moral objections to the death penalty.

"(g)  Whether or not defendant acted under extreme duress or under the substantial domination of another person.

"(h)  Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, or the [e]ffects of intoxication.

"(i)  The age of the defendant at the time of the crime.

"(j)  Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.

"(k)  Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." Cal Penal Code Ann § 190.3 (West 1988).

Oregon has no such detailed list requiring that facts be found.

## II. PROPORTIONALITY

Defendant maintains that he is entitled to a proportionality review. Defendant's brief states "[t]his issue is based on defendant's pretrial motion, which would, in essence, have required the *trial judge* to undertake a proportionality review of the imposition of the death" sanction. (Emphasis added.) Defendant's brief also states that:

"The prosecutional decision to charge an individual with *aggravated murder* and *to seek the death penalty based on a* conviction of that crime is arbitrary and capricious. Negotiations are not being undertaken in a uniform manner throughout the state, resulting in the unfair and disparate treatment of individuals depending on geographical location. Defendant contends that this could have been documented in [the] trial court had the judge permitted defendant's motion, and required the state to produce evidence of the charging decisions throughout the State of Oregon. At the very least, based on this argument, remand for a hearing [on defendant's motion or on that statewide information previously sought] is required."

Formerly, the United States Supreme Court has indicated that states are not required by due process to have post-sentence review of death penalty sentences on the basis of the proportionality of one individual sentence as against another. The case so holding arose in California where, as we

have already seen, the statute indeed requires that the trial judge review the sentence and grants judges power to modify the sentence both at the trial level and on appeal. Oregon has no such post-verdict review. *Pulley v. Harris*, 465 US 37, 104 S Ct 871, 79 L Ed 2d 29, (1984).[4] In *Pulley*, the court held that "comparative proportionality review by an appellate court is [not] required in every case in which the death penalty is imposed and the defendant requests it." 465 US at 50-51. The court then said:

> "Assuming that there could be a capital sentencing system so lacking in other checks on arbitrariness that it would not pass constitutional muster without comparative proportionality review, the 1977 California statute is not of that sort." *Id.* at 51.

The court then noted that the California statute required an independent determination by the trial judge who reviewed the evidence that was before the jury after the jury's verdict and who was required to make findings and to state reasons for the findings on the record. Then the appellate court must review the trial judge's refusal to modify the sentence, if that is the trial judge's decision. However, the California scheme does not in so many words require that the review of the trial judge or of the appellate court be based on the proportionality of the sentence compared with other sentences within the jurisdiction. It calls for a judicial determination whether the evidence related to aggravation and mitigation makes the death verdict contrary to law or evidence presented. *Ibid.*

The sentencing jury may exact death when that is comparatively excessive in relation to other juries statewide, and, thus, is federally cruel and unusual because the Oregon process, even after *Wagner v. Oregon, supra,* permits the jury to make the death determination on a standardless and unreviewable basis.

I would hesitate long before saying that Oregon juries would act arbitrarily or capriciously. The death penalty scheme as amended by the legislature in 1991 nonetheless leaves them in a situation where they can do so free of review. Their decision is so unguided and unreviewed as to permit an arbitrary and capricious application rather than a reasoned,

---

[4] The issue also came up on habeas corpus, not direct appeal.

individual moral judgment. In such circumstances, proportionality review would seem to be the only way to enforce the Eighth Amendment and its prohibition against administering death in cases having circumstances where it would be, in the federal court's eyes, cruel and unusual punishment to execute the particular individual defendant. Accordingly, because Oregon does not employ the safeguards present in the *Pulley* case and because of the Court's later decisions in *Haslip* and *Oberg*, observance of both due process and the Eighth Amendment require that proportionality review be undertaken on a statewide basis in Oregon death penalty cases. Whether that review is to be undertaken at the point where death or not death is determined, by the jury, or by the judge, or both, need not be determined here. That stage was not reached because defendant's discovery request was, erroneously, denied. Moreover many states now make provision for a proportionality review. Wallace & Sorenson, *Missouri Proportionality Review: An Assessment of a State Supreme Court's Procedures in Capital Cases*, 8 Notre Dame JL Ethics and Pub Pol'y, 281, 287 n 31 (1994). By statute, Oregon requires that sentences be proportional. ORS 161.025(1) in part provides:

> "The general purposes of chapter 743, Oregon Laws 1971, are:
>
> "\* \* \* \* \*
>
> "(f)    To prescribe penalties which are proportionate to the seriousness of offenses and which permit recognition of differences in rehabilitation possibilities among individual offenders.
>
> "(g)    To safeguard offenders against excessive, disproportionate or arbitrary punishment."

Denial prevented even the possibility of operating this state's death process up to federal standards.

For the foregoing reasons, I would hold that defendant's death sentence in this case should be vacated and the case remanded for resentencing to "life imprisonment without the possibility of release or parole" under ORS 163.105-(1)(a)(b).

I respectfully dissent.