Argued and submitted July 29, reversed October 9, 2013

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## MICHELLE BETH EVILSIZER,
*Defendant-Appellant.*

Washington County Circuit Court
C092367CR; A149334

311 P3d 983

Erik Blumenthal, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Karla H. Ferrall, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

HADLOCK, J.

## HADLOCK, J.

Defendant, who worked as a nurse at a nursing home, was charged with tampering with drug records, ORS 167.212. The indictment alleged that she "ma[d]e and utter[ed] a false or forged prescription * * * for a controlled substance." At trial, the state presented evidence that defendant had written on a nursing-home resident's "medication administration record" (MAR) that she had given the resident three Oxycodone tablets when, in fact, she had given the resident only one tablet and kept the other two for her own use. Defendant moved for a judgment of acquittal, arguing that the MAR is not a written order or prescription within the meaning of ORS 167.212 and that, even if it were, she did not forge the prescribing portion of that document. The trial court denied the motion, and defendant was convicted. We reverse.

In reviewing the denial of a motion for judgment of acquittal, we view the evidence in the light most favorable to the state to determine whether a rational factfinder could have found the elements of the crime beyond a reasonable doubt. *State v. Cunningham*, 320 Or 47, 63, 880 P2d 431 (1994), *cert den*, 514 US 1005 (1995). At the nursing home where defendant worked, Camelot Care Center, all medications given to a resident of the facility were prescribed by the resident's doctor and sent to the facility, where a nurse listed them on the resident's MAR. Several pages from the April 2009 MAR for G, the resident from whom defendant took the Oxycodone, were submitted into evidence. Each page has preprinted tables on it. On the first page, the left-hand column of the main table is marked "Order." In the spaces in that column, a nurse wrote the name of each medication that a doctor had prescribed for G, along with the dosage and the frequency at which the medication was to be given. The handwritten order in one space states that G was to receive one to three 5-milligram tablets of Oxycodone every four hours "prn pain"—meaning "as needed for pain." The table also includes 31 columns, one for each day of the month, that are divided into four spaces for each medication, in which a nurse wrote his or her initials each time the medication was given.

Subsequent pages of the MAR include a table labeled "nurse's medication notes." The nurse dispensing any "as needed" medications filled in information including the date and time that the medication was given, the nurse's initials, and the name of the medication. If a nurse attempted to dispense a prescribed narcotic medication and the resident refused it, Camelot's policy was for the nurse to note the refusal on the MAR and to destroy the medication in another nurse's presence.

During one eight-hour night shift on April 27 and 28, 2009, defendant recorded on the "nurse's medication notes" that she had, three times, given G the maximum prescribed three-tablet dose of Oxycodone—at 10:45 p.m., 2:30 a.m., and 6:20 a.m. On the first page, in the spaces provided for nurses to initial each time an ordered medication had been given, defendant initialed one space each for April 27 and 28, even though she had given G two doses on the 28th. Other nurses on the staff became concerned because defendant had administered the medication at somewhat less than four-hour intervals and because the three-tablet dosage was higher than normal for G.

Approximately two weeks later, Adult Protective Services received a complaint about prescription medications being stolen from Camelot residents. An investigator contacted the police, and a police officer interviewed defendant. During the interview, defendant admitted that, on the night in question, she had taken two of G's prescribed Oxycodone tablets for her own personal use. Defendant later told the investigator from Adult Protective Services that G had not wanted all three tablets one of the times that defendant had administered them, so defendant gave her one tablet and kept the other two.

Defendant was charged with tampering with drug records in violation of ORS 167.212, which provides, in part:

"(1)   A person commits the crime of tampering with drug records if the person knowingly:

"*****

"(c)   Makes or utters a false or forged prescription or false or forged official written order for controlled substances[.]"

The indictment alleged that defendant "did unlawfully and knowingly make and utter a false or forged prescription or official written order for a controlled substance."[1] The state presented witnesses who testified about the facts described above. In addition, two nurses from the nursing home testified that the MAR was a "direction given by a practitioner for the preparation and use of a drug."

After the state presented its case-in-chief, defendant moved for a judgment of acquittal. The state conceded, and the trial court agreed, that the state had not presented any evidence concerning an "official written order." The court ruled, however, that the state had presented enough evidence that the jury could find that defendant had forged a prescription.

Defendant then called one witness, a pharmacist who testified that G's MAR was not a prescription for Oxycodone. He explained that the MAR did not include information required by law for a prescription for a "schedule 2" drug such as Oxycodone, including the patient's address and the prescribing doctor's signature and Drug Enforcement Agency number. On cross-examination, however, he agreed that he would consider a "written, or oral, or electronically transmitted direction given by a practitioner for the preparation and use of a drug" to be a prescription. He also conceded that a written prescription that was not signed by a doctor would be invalid but would "still be a prescription."

After defendant rested, the court instructed the jury that, to find defendant guilty, it had to find that she had "made or utter[ed] a false or forged prescription for controlled substances * * *." The court also instructed the jury that a "prescription" is a "written, oral or electronically transmitted direction given by a practitioner for the preparation and use of a drug."[2] The jury found defendant guilty. This appeal followed.

---

[1] Defendant was also charged with two counts of first-degree criminal mistreatment, ORS 163.205, and a second count of tampering with drug records. For reasons not disclosed in the record, the state dismissed those charges before trial.

[2] The complete instruction that the court gave was as follows, under the heading "DEFINITIONS":

"*Prescription*—a written, oral, or electronically transmitted direction, given by a practitioner for the preparation and use of a drug. When the context

Defendant assigns error to the denial of her motion for judgment of acquittal.[3] She contends that the MAR is not itself a prescription, but only a *record* of the prescriptions given by G's doctor. Even if the "order" portion of the MAR constitutes a prescription—that is, a "direction given by a practitioner for the preparation and use of a drug"—defendant argues that a person "makes or utters a false or forged prescription" only when the person falsifies that part of the MAR, *i.e.*, "falsifies the practitioner's instruction." In this case, defendant asserts, the state did not present any evidence that she falsified any portion of the doctor's instructions for preparing or using the Oxycodone. Instead, she contends, "the state's evidence and theory of conviction was that defendant *logged* having given [G] three pills when in fact, she gave [G] one." (Emphasis in original.) In defendant's view, the falsified portion of the MAR—defendant's "log notes"—was not a prescription, but merely Camelot's record of whether G's prescriptions were administered properly.

The state responds, first, that defendant construes the word "prescription" too narrowly. It starts by asserting that we should apply the common dictionary definition: "a written direction for the preparation, compounding, and administration of a medicine." *Webster's Third New Int'l Dictionary* 1792 (unabridged ed 2002). The state then goes on, however, to argue for an even broader definition, asserting that a "prescription is more than a doctor's initial directions to his or her patient." According to the state, a prescription "includes the directions transmitted to the patient's caregivers. And when a caregiver has primary responsibility for ensuring that a patient accurately follows those directions, it covers the record-keeping associated with that duty." In the state's view, then, when defendant recorded on the MAR that she had given G three Oxycodone tablets, rather than

requires, prescription also means the drug prepared under such written, oral, or electronically transmitted direction. Any label affixed to a drug prepared under written, oral, or electronically transmitted direction shall prominently display a warning that removal thereof is prohibited by law."

That instruction is Uniform Criminal Jury Instruction 2600(26), which is expressly drawn from, and quotes verbatim, ORS 475.005(19).

[3] Defendant also assigns error to the trial court's denial of a motion defendant made to dismiss on speedy-trial grounds. Because we conclude that defendant was entitled to a judgment of acquittal, we do not address the speedy-trial issue.

one, she falsified a prescription for a controlled substance in violation of ORS 167.212(1)(c).

We begin by considering the proper definition of "prescription." As the state points out, the definition on which defendant relies comes from ORS 475.005(19). Defendant was charged with tampering with drug records under ORS 167.212. ORS 167.203 furnishes definitions for several of the terms used in ORS 167.212. Several of those definitions expressly cross-reference ORS 475.005. *See* ORS 167.203(2) ("'Controlled substance' and 'manufacture' have the meaning given those terms by ORS 475.005."); ORS 167.203(4) ("'Practitioner' has the meaning given that term by ORS 475.005."). ORS 167.203 does not, however, define "prescription," either by cross-reference to ORS 475.005 or otherwise. The legislature's choice not to define "prescription" by cross-reference to ORS 475.005(19) lends some weight to the state's argument that the definition should not apply in this context.

However, the state overlooks a critical fact: The trial court instructed the jury on the definition of "prescription." Neither party excepted to that instruction, so it is the law of the case.[4] *See Fulton Ins. v. White Motor Corp.*, 261 Or 206, 223 n 5, 493 P2d 138 (1972) (because neither party objected to a jury instruction, it became the law of the case, even though the formulation of the rule given in the instruction had been disapproved). Accordingly, our task is to determine whether the state presented any evidence from which the jury could have found that defendant made or uttered a false or forged prescription, applying the same definition of "prescription" that the jury did. *See Wampler v. Sherwood*, 281 Or 261, 267, 574 P2d 319 (1978) (first holding that a rule stated in a jury instruction to which neither party objected was the law of the case and then, to determine whether the trial court erred in denying motions for nonsuit, directed verdict, and judgment notwithstanding the verdict, considering whether there was evidence from which the jury could have "found that the requirements of the rule as stated in that instruction were satisfied"). In performing that task, we must read the instruction defining "prescription" as the

---

[4] Indeed, the state requested the instruction.

jury might reasonably have understood it. *See Forster v. Kawasaki Motors Corp.*, 73 Or App 439, 449, 698 P2d 1001, *rev den*, 299 Or 663 (1985).

As the jury was instructed, and as pertinent here, a "prescription" is a "written, oral or electronically transmitted direction given by a practitioner for the preparation and use of a drug."[5] Notably, that definition does not differ materially, at least for purposes of this case, from the dictionary definition that the state cites on appeal: "a written direction for the preparation, compounding, and administration of a medicine." Both of those definitions focus on the "direction" for the preparation or use of a drug; that is, they define "prescription" as the statement of what is *to be done* in the future with respect to giving medication to a patient.

With the jury instruction defining "prescription" in mind, we turn to the question of whether the evidence could support a finding that, by falsifying the amount of Oxycodone that she gave to G, defendant made a "false or forged prescription." We conclude that the evidence was not sufficient to support a conviction. We need not address defendant's contention that the "order" portion of the MAR was not a prescription, but merely a record of the prescriptions given by G's doctor. Even assuming that the information regarding Oxycodone in the "order" column on the first page of the MAR was a prescription—that is, a "direction given by a practitioner for the preparation and use of" Oxycodone— there is no evidence that defendant falsified that information. Put differently, the record includes no evidence that defendant forged or falsified the portion of the MAR that was forward-looking, *i.e.*, that directed how medicine was to be used or administered *in the future*.

As noted, although the state initially cites a dictionary definition of "prescription" that, like the instruction given to the jury, centers on a practitioner's "direction" regarding medication, it also urges us to adopt a definition that includes the recordkeeping associated with following that direction. Such a broad definition would be necessary

---

[5] The instruction also stated that, when the context requires, "prescription" may include "the drug prepared under such written, oral, or electronically transmitted direction." That aspect of the definition does not apply here.

to support the conviction of defendant, whose allegedly criminal conduct involved the act of falsely recording that she had given G three Oxycodone tablets, not one. But the state offers no support for its contention that "prescription" should be defined to include a nonprescribing nurse's *backward*-looking record of what already *has been done* with a prescribed medication. Nor do we find any support for such an understanding of "prescription" in the jury instruction.

In sum, the record includes no evidence from which the jury reasonably could have found that the information that defendant falsified was the type of forward-looking "direction" that is a necessary component of a prescription, at least according to the jury instruction. It follows that the state failed to adduce evidence from which the jury could find that defendant made or uttered a false or forged prescription for a controlled substance. The trial court erred in denying defendant's motion for judgment of acquittal.

Reversed.